SIXTH DIVISION
February 2, 2007

No. 1-04-1852

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 690 |
| | ) | |
| WILLIAM WARD, | ) | Honorable |
| | ) | Camille E. Willis, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Defendant, William Ward, appeals after his conviction by a jury of two counts of aggravated battery with a firearm. Defendant first argues that the State failed to prove his guilt beyond a reasonable doubt, asserting that his identification by a witness was too doubtful and unreliable and that there was insufficient evidence to prove that he possessed the weapon used in the shooting at the time the shooting occurred. Defendant also alleges that the State injected reversible error into the trial by minimizing its burden of proof and inflaming the jury's passions and prejudices in its closing argument. He further contends that the circuit court erred by: declining to grant his motion to suppress; allowing the jury to determine that the victims suffered severe bodily injuries; failing to question the jurors individually after one of them indicated that defendant communicated with him, and that he had shared that experience with his fellow jurors; failing to give the jury the instruction required by People v. Prim, 53 Ill. 2d 62 (1972), when the jury indicated that it was deadlocked; and failing to conduct a hearing as required by People v.

1-04-1852

Krankel, 102 Ill. 2d 181 (1984), when presented with defendant's *pro se* complaints of ineffective assistance of counsel. Further, defendant claims that his trial counsel was ineffective for failing to object to the circuit court's refusal to provide a copy of the transcript of the identifying witness's testimony to the jury, when the jury asked for the transcript. Finally, defendant contends that his counsel was ineffective for failing to preserve his alleged errors surrounding the State's closing argument, the lack of jury questioning, the absence of a Prim instruction, and for misinforming defendant that his posttrial motions would be prepared by the state appellate defender.

We affirm.

FACTUAL BACKGROUND

On December 29, 2000, a grand jury indicted defendant for six counts of attempted first degree murder, two counts of aggravated battery with a firearm, six counts of aggravated battery, two counts of aggravated discharge of a firearm, three counts of aggravated unlawful use of a weapon, and two counts of unlawful use of a weapon by a felon. These charges stemmed from the drive-by shooting of two people in Harvey, Illinois, on September 24, 2000.

At defendant's trial, Officer Montague Hall testified that he was a Harvey police officer on September 24, 2000. Around 7:25 p.m., he responded to a call of shots fired in an alley around 150th and Honore. Hall recovered two .9-millimeter bullet casings at the scene. He spoke with a man on the ground who had been shot in his leg who was subsequently transported to Ingalls Hospital in an ambulance. Hall also spoke with two other people, James Tolbert and Terrence Coprich, who provided him with descriptions of two possible offenders. Hall recorded

-2-

their descriptions, as to both persons, as "male Black, unknown height, unknown weight, unknown complexion," in his police report. He suggested that the undetailed descriptions he recorded were insignificant because the investigating detectives would reinterview witnesses to obtain more specific information.

Harvey Detective Samuel White testified that he was assigned to investigate the September 24 shooting in the alley around 150th and Honore. In the course of the investigation, he interviewed Tyrone Moten on October 29, 2000. At the time, Moten was in police custody based on a parole violation. After speaking with Moten, White began to look for defendant.

White testified that on November 17, 2000, he went to defendant's residence. He knocked on the door, but nobody answered. As he was leaving, he saw defendant drive up toward the residence. The two made eye contact and defendant drove off. White chased defendant in his car to 164th Street and Halsted, where defendant exited his car. When White tried to take him into custody, defendant punched White. However, White was able to get defendant to the ground and handcuff him. Other Harvey police then transported defendant to the police station, while White returned to defendant's residence.

Upon his return, White entered defendant's residence with Illinois Department of Corrections (IDOC) parole agent Agent Giorgakis. White observed Giorgakis search the bedroom, from which he recovered a safe and ammunition. White and Giorgakis then returned to the police station, where they opened the safe and discovered a loaded gun, ammunition, and a magazine.

1-04-1852

The following day, White spoke with defendant. Defendant admitted that he had stolen the gun from his girlfriend, who lived with him at that residence. White then sent the gun and ammunition to the Illinois State Police crime lab.

The next day, on November 19, 2000, White met with one of the shooting victims, Michael Walker at Christ Hospital. White was accompanied by a felony review assistant State's Attorney. White presented Walker with a photo array of six men, defendant and five others. However, Walker was unable to identify defendant as the person who shot him. In fact, he pointed to another person as the person he thought shot him. White testified that he no longer knew the whereabouts of the photo array he had shown Walker.

Giorgakis next testified for the State. He testified, consistent with his suppression hearing testimony, that he was at defendant's residence with White on November 17, 2000. Giorgakis corroborated White's account of defendant pulling up to his home, seeing the officers, and then speeding away. He further confirmed that defendant struck White after stopping and exiting his car at 163rd Street and Halsted.

Giorgakis then described how he returned to search defendant's residence. He explained that he searched the bedroom and recovered ammunition and a lockbox from under the bed. He took the lockbox to the Harvey police station, opened it there, and recovered from within a .9-millimeter handgun as well as four fully loaded clips. He testified that he turned these items over to White.

Terrence Coprich testified next as to the occurrence of the shooting itself. Coprich admitted that he was a convicted felon whose probation had been terminated unsatisfactorily.

-4-

Coprich testified that on September 24, 2000, he was in the backyard of James and Michael Tolbert's house at 150th and Honore. Michael Tolbert was working on Walker's car. Moten came by and he, Coprich, and unspecified others, got into a car and drove to 158th and Vine to look into a fight involving Moten that had occurred there earlier. There, while some spoke with an acquaintance named Cliff, Moten, a woman named Sakina, and defendant got into a fistfight. Defendant then ran to the back of the house at 158th and Vine. While most of the party got back into their car, Moten remained outside, picked up a brick, and smashed out the windows of defendant's truck. Moten then reached into the truck and took a blue and red hat known as a "one-fifty," based on its price of $150, from the front seat. Coprich grabbed Moten, chastising him for his conduct, and pulled him into the car. The entire party then returned to the Tolberts' residence.

After returning to 150th and Honore, Coprich and three others decided to get some beer. As they went back to his car after making the purchase, they noticed a gray station wagon pass by. Coprich recognized defendant as the front passenger in the wagon. Coprich and the others got in his car and followed the station wagon. Coprich surmised that the people in the wagon knew where his friends were, so he turned into the alley adjacent to the Tolbert residence to try to warn his friends to disperse. However, as he approached them, the station wagon entered the alley from another direction. Coprich testified that he again saw defendant and another man in the wagon as the cars became parallel, with the passenger doors of the two cars facing each other. He described the distance between himself and defendant at that moment as matching the distance between himself and the jury box at the time of his testimony. He described defendant

as having "his head straight." Coprich then saw "a gun come up," "fire," and heard "popping." According to Coprich, defendant shot across the driver's seat of the wagon. Coprich fled by driving his car away from the scene, but then returned to check on his friends. He came back to find Walker already on his way to a hospital and J.C. Johnson lying on the ground shot in the leg and hip.

On November 19, 2000, Coprich viewed a lineup at the Harvey police department. At that time he picked out defendant as the person he observed shooting.

On cross-examination, Coprich originally testified that he did not remember if he talked to the first police officers to come to the scene of the shooting, but that he had been told he did. He then testified that the first officers asked him "about what went on," that he answered the officer's questions, and that he observed the officer taking notes. Coprich further acknowledged that, on the same day he observed the lineup, he gave a statement to Detective White and Assistant State's Attorney Alzetta Bozeman. Coprich testified that he told Bozeman about the fight between Moten, Sakina, and defendant, preceding the shooting, and Moten's breaking of the windows of defendant's truck. He explained that he declined to write out his statement himself, leaving it to Bozeman to record what he said. He further testified, however, that he checked over her recording of his statement, made no corrections, and signed it, along with White and Bozeman. On redirect, the State did not dispute that the written statement did not mention the preceding fight and vandalism, but only described the shooting itself.

J.C. Johnson testified that on September 24, 2000, he was with Walker, Moten, Sakina, and Lamont Crims at the Tolbert home. Walker wore a blue and gray baseball hat at the time.

As he and Walker walked down the alley behind the home a cream-colored station wagon drove toward them. Gunfire began to come from the wagon and the two turned and started to run. Johnson was struck by a bullet and fell to the ground. He did not see what happened to Walker, nor did he see who shot him.

Johnson testified that an ambulance took him to the hospital where he was treated for a dislocated shoulder and a gunshot wound to the buttock. The bullet had passed through and shattered his right femur. The gunshot wound required two surgeries, one on the day of the shooting, and a later procedure for the removal of a nerve. Johnson could not feel his feet at the time of his testimony and his shoulder continued to "pop out" regularly.

Michael Walker was the next State witness. On September 24, 2000, he took his car to the Tolbert home to have Michael Tolbert perform repairs. He remembered Tolbert, Johnson, Coprich and Moten all being present. At one point, they all got into cars; Walker thought they were going to get beer. Instead, they ended up at 158th and Vine, where he saw Moten, Moten's cousin, and defendant get into a fistfight. As he was driving away, Walker saw Moten break the windows of a sport utility vehicle. On the way back to the Tolberts', he stopped at a music store and bought some compact discs. Upon his return to 150th and Honore, he met Moten, who gave him a hat that Moten said matched his outfit.

Walker stayed in the alley behind the Tolbert residence talking with Michael Tolbert until he saw Coprich's car stop nearby. As he approached Coprich's car, Walker observed a station wagon drive toward him. He next saw someone raise a gun and he turned and ran. While running away, he was shot in the back. Walker found himself lying in a puddle gasping for air;

he could not feel his legs. The Tolbert brothers rushed him to a hospital. Walker's next memory was of waking up in the hospital and being told that he was a paraplegic. Walker testified that the lowest point at which he now had any sensation was just below his neckline. One bullet was left in his body because it was too close to an artery to permit safe removal.

On November 19, 2000, Walker was rehospitalized. During this hospitalization, he was visited by Assistant State's Attorney Bozeman and Detective White. The two showed him a photo array. However, he testified that he could not identify the person who shot him because he "instantly" turned and ran when he saw the gun. He did say that one person in the lineup resembled the shooter, but never conclusively identified anyone.

Forensic scientist Jeffrey Parise was the final witness for the State. After being qualified as an expert in firearm identification, Parise testified that he received a Glock model 17, 9-millimeter semiautomatic pistol, and two fired 9-millimeter Luger cartridge cases for analysis. After ensuring that the gun was safe to test fire, he loaded two 9-millimeter Luger Sellier-Bellot brand cartridges into the gun and fired those rounds into a collection device known as a cotton box, collecting the spent shell casings afterwards. Parise explained that the firing of a gun left a number of markings on shell casings. The firing pin makes an impression on the primer of the casing, which is also marked by the breach face, where the firing pin passes through. The casing is also marked by the extractor, which removes the cartridge from the firing chamber, as well as the chamber itself. Parise examined the casings from the shots he fired and discovered that they matched each other. He then compared the casings from the shots he fired with the casings the Harvey police department gave him, using a side-by-side comparison microscope. From that

1-04-1852

comparison, he formed the opinion, to "a reasonable degree of scientific [and] technical certainty," that the casings he received from the police had been fired from the gun he received from the police, "to the exclusion of all others."

The defense declined to call any witnesses. Instead, the defense introduced into evidence defendant's birth certificate and the registered address for defendant with the Secretary of State, which differed from the address where the ammunition and lockbox containing the gun were found.

After closing arguments, over defendant's objection, the circuit court gave the following instruction to the jury:

> "Members of the jury, if you have found the defendant guilty of the offense of attempt first degree murder and/or aggravated battery with a firearm, you must then decide whether or not severe bodily injury occurred during the commission of the attempt first degree murder.
>
> If you decide unanimously beyond a reasonable doubt that severe bodily injury occurred during the commission of the attempt first degree murder and/or aggravated battery with a firearm, then you must sign the form indicating your decision."

At the instructions conference, the defense had suggested that the determination should be bifurcated, only allowing the jury to determine whether severe bodily injury occurred after it determined guilt.

Jury deliberations began at 4:22 p.m.. Subsequently, the jury sent a note to the circuit

-9-

court, which it received at 5:30 p.m.. The note stated: "We need written Statement from Terrance Coprich and also a transcript of his testimony in Court." With the agreement of the parties, the circuit court prepared the following response: "The evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the court has received. The transcript of Terrance Coprich's testimony is not available." At 6:05 p.m., the circuit court received another note stating, in part: "We need to know if the previous note is being considered- After over 1 hour, we are still at the same point and waiting for a response from you." The court advised the parties that, upon receiving the jury's note, it realized its original response had not been sent and, thereupon, sent it immediately. The court received one more note from the jury at 6:35 p.m., again asking for Coprich's written statement. Again, with the approval of the parties, the judge responded: "The evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the court has received. Please continue to deliberate." At 7:30 p.m., the court received yet another note from the jury. The jury informed the court: "At this time *** we are a hung jury. We have voted 3 times and discussed each time what the key points are for each juror. Some members have clearly expressed that they will not change their minds." To this note, the court and parties agreed that the appropriate reply was "Please keep deliberating." Within one minute of receiving the court's last note, the jury sent one more note to the court, received at 7:48 p.m., advising "We need to know what the court's definition is of 'reasonable doubt.' " All agreed that the appropriate response was "You have all of the instructions. Please keep deliberating." The jury sent one final note to the court at 8:10 p.m., received by the court at 8:24 p.m. The note said:

1-04-1852

"We previously requested at 5:40 p.m., the courtroom transcript of

Terrance Coprichs [*sic*] testimony. You replied that it was not available.

All decisions are being made mostly upon this testimony.

Without this transcript we can not [*sic*] break the hung jury. We

need to know when this transcript will be available. Please be specific."

The court responded, without objection from the parties: "The transcript is not available. I do not

know when or if it can become available in the future. Please keep deliberating."

At approximately 9 p.m., the circuit court dismissed the jury for the day, instructing the

jurors to return the following day at 9:30 a.m. However, another issue arose that night. A deputy

informed the court that, while escorting the jurors out of the jury room, one of the jurors told him

that defendant looked at him and said something and that he became uncomfortable. The court

questioned that juror, whose name was Uriaus, outside of the presence of the rest of the jurors

and asked for him to describe what had occurred. Uriaus related:

"I was seated in the back row at the far end of the jury seats. While

you were speaking, giving us our final directions, I was spending time

looking basically at the reactions and general mannerisms of the four

attorneys and the defendant and had made eye contact with all five of them

during the time of which you were speaking. At one point, the defendant

leaned well back in his chair so that we specifically had eye contact, kept

eye contact for a couple of seconds, shook his head no, and I believe he

mouthed, 'don't do it.' And that made me uncomfortable."

Uriaus then asked to add that "[t]here was also talk previous to this incident this evening" "in the jury room." The circuit court, however, initially indicated that it did not "want to hear about any conversations that took place in the jury room." The court, at first, maintained this position in spite of defense counsel's argument that "[w]e need to hear."

The court then inquired of Uriaus if he thought he could still be impartial. Uriaus assured the court that he could.

The circuit court then, while again explaining that it did not want to know the content of any such conversations, asked if anything was said that "would make you feel threatened or uncomfortable regarding Mr. Ward, specifically addressed to Mr. Ward only." Uriaus indicated that there were no conversations among the jury of that type and reaffirmed that he could be an impartial juror. He also informed the court that he had told the other jurors about defendant's attempted communication with him, however.

Defense counsel requested that the court ask Uriaus why he disobeyed the court's previous instruction to the jury not to discuss anything about the case with his fellow jurors until the commencement of deliberations, if he were going to remain on the jury. The court then asked if the defense had any further arguments, and counsel stated "There are several options for me right now. I would like to take the night to think about it." Finally, the court indicated, "My question is whether it's necessary to poll the other jurors based upon the statement that was made by this one juror." The State recommended addressing that question the following morning, and defense counsel agreed.

The following day, prior to the recommencement of deliberations, the State requested that the court poll each juror to inquire if he or she had observed anything that should be brought to the court's attention, or if he or she heard about anything from another juror that should be brought to the court's attention. The State proposed that if any juror responded affirmatively, then he or she should be asked if he or she could remain fair and impartial. When asked for his response, defense counsel replied "No response."

The court denied the State's request, observing:

"I was in the courtroom. I saw no actions on Mr. Ward's behalf that I would believe could be perceived as an attempt to intimidate the jurors in this matter. I will note that this juror did indicate that he had communicated what he believed to have been said by Mr. Ward to the other jurors.

Notwithstanding that, I believe that by polling them I will be bringing attention to something that more than likely did not occur."

The defense made no comment on the court's ruling.

Deliberations continued, but, at 10:15 a.m., the jury sent the court another note, stating: "We are still a hung jury. We again request the courtroom transcript of Terrance Coprichs [*sic*] testimony. This will continue to be a vital need of our deliberations." The State suggested to the court that it should attempt to acquire the transcript so the jury could make a decision. The defense, on the other hand, objected to a transcript going to the jury, contending that a jury was supposed to deliberate based on its collective memory. The court observed that Coprich's

testimony was "very brief" and "uncomplicated," and "was extremely incriminating and damaging to the defendant." The court therefore sent the jury a response of: "I have considered your request for a transcript of Terrance Coprich's testimony. That request is denied. Please rely upon your collective memory of the evidence." At 12:35 p.m., the jury sent its final note to the court, indicating, "We have reached an [*sic*] unanimous decision on all counts."

The jury acquitted defendant on the two remaining counts of attempted first degree murder, but convicted him of two counts of aggravated battery with a firearm, one count for J.C. Johnson and one count for Michael Walker. The jury also signed forms indicating that it had found beyond a reasonable doubt that severe bodily injury occurred during the commission of the aggravated battery with a firearm, both to Johnson and Walker. Defendant requested that the jury be polled and each juror affirmed that the verdict was his or hers both at the time of signing the verdict and at the time of polling.

After a sentencing hearing, the court imposed a 20-year sentence for one count to be followed by a consecutive 15-year sentence. At the conclusion of the hearing, the court asked defendant if he had any questions surrounding his sentence. Defendant replied:

> "Yes, I do.
>
> I want to know why, first of all, I took a jury and everything, but there is a lot about my case that you still do not know about and there was a lot of evidence that was not submitted in my trial, in my motion.

I had signed affidavits and a lot of other things that was not

submitted, you know, and I blame that on–and the fact of my counsel, and

I ask that, you know, that you take all that into consideration, you know."

The court responded that it would appoint the appellate defender to assist him in his posttrial

motions "or anything that you wish to present." Defense counsel stated that he had "already

advised" defendant of that fact. Later, after the court admonished defendant of his appeal rights,

defendant appeared to want to revisit the performance of his trial counsel. However, after

defendant's statement that he "had a lot of evidence," the circuit court interjected "Mr. Ward, I

am not retrying the case today." In response, defendant informed the court that his attorney

possessed the evidence he spoke of and wanted the evidence returned to him so that he could

submit it to the court himself. The court instructed defendant to speak to his attorney about the

return of that evidence.

Defendant's trial counsel, in fact, filed motions for a new trial and for reconsideration of

his sentence. Both, however, were denied.

Prior to trial, defendant filed a "Motion to Suppress Physical Evidence." In this motion,

defendant alleged that "on November 17, 2000 police and other government agents, without

lawful authority, seized certain property which might tend to incriminate the accused, *i.e.*: a gun

from a safe in the residence searched." The motion to suppress came for hearing on April 26,

2004.

The suppression hearing began with a stipulation between the defense and the State that

Marshon Shelby, defendant's girlfriend, would testify that a safe recovered by personnel from the

Harvey police department and the Illinois Department of Corrections (IDOC) at 15745 Lathrop, on November 17, 2000, belonged to defendant.

The first and only witness at the suppression hearing was Agent Giorgakis, called by defendant. Giorgakis testified that he and fellow IDOC agent Rucker reported to 15745 South Lathrop in Harvey, the address IDOC had as defendant's residence, on November 17, 2000.[1] Giorgakis was dispatched there after the Harvey police department contacted his supervisor. On the way to the Lathrop address, his supervisor informed Giorgakis that defendant was wanted for questioning in a shooting. Upon arrival, they met Harvey Detective White, who was waiting for them.

Giorgakis testified that he and Rucker went to perform a compliance check, which he explained was a search for contraband, such as "drugs, guns, [or] stolen merchandise." According to Giorgakis, since defendant was on parole, "he was subject to compliance checks at any time with cause." The cause for the check at that time was a charge against defendant for possession of a controlled substance in April 2000, and because the Harvey police department had informed Giorgakis's office that defendant was wanted for questioning in an attempted murder case involving a gun. Giorgakis testified that when he met White, he did not have any significant discussion surrounding the attempted murder. According to Giorgakis, "[h]e just let

---

[1] Defendant's presentence investigative report revealed that defendant was on mandatory supervised release (MSR) following a conviction and prison time served for delivery of cocaine. He was scheduled to be discharged from MSR on March 16, 2001.

me know he was identified and was wanted for investigation." They did not have a warrant for a search of the residence, nor did they have defendant's explicit consent for a search at that time.

When Giorgakis and Rucker knocked at the door, other adults living at the address let them in, though Giorgakis did not know who they were, since he was not defendant's regular parole agent. He and Rucker then went to defendant's bedroom. While Harvey police entered the residence, Giorgakis's supervisor blocked them from entering the bedroom,[2] which Giorgakis testified was the only room IDOC had authority to search. When Giorgakis looked underneath the bed, he discovered a locked box, which the agents took to the Harvey police station, since they did not have the tools with them to force it open. At the station, Giorgakis pried the box open with a crowbar. Inside, they discovered a Glock 9-millimeter handgun with three 16-round magazines and a 30-round magazine. The IDOC agents left these items with the Harvey police. Again, there was no warrant or consent to search the box.

At the conclusion of Giorgakis's testimony, defendant argued that the State could not enter a parolee's home without reasonable suspicion of wrongdoing under the totality of the circumstances. Defendant contended there was no reasonable suspicion in this case because the possession of a controlled substance charge was far removed in time from the date of the search. He further argued that the compliance check was, in fact, a pretext; that the Harvey police department used IDOC to conduct a search for the gun because the police knew they did not have

---

[2] The testimony does not reveal when the supervisor arrived on the scene or what other actions, if any, he may have taken.

sufficient probable cause, a higher standard than reasonable suspicion, to obtain a warrant so as to conduct the search themselves. The State countered by emphasizing that parolees have a reduced expectation of privacy. The State further argued that the possession charge and his status as a suspect in a shooting allowed for reasonable suspicion that defendant was engaged in criminal wrongdoing.

The circuit court denied the motion. The circuit court agreed with defendant that the Harvey police department used IDOC for its own purposes. However, the court found that fact to be unimportant considering defendant's reduced expectation of privacy as a parolee and the reasonable suspicion created by the possession of a controlled substance charge. The court also, while finding it unnecessary to make an explicit ruling, "believe[d] arguably the information that the Illinois Department of Corrections received about the defendant being identified as a shooter may have been sufficient in and of itself."

Defendant now appeals.

ANALYSIS

I. Outside Influence on the Jury

Defendant contends that he was denied a fair trial because the circuit court did not act sufficiently to ensure that the jury was not tainted by a communication Juror Uriaus received from defendant and which Uriaus then described to his fellow jurors prior to informing the court of its occurrence. The State, however, contends that we should not review this claim because he is now taking a position on appeal contrary to that he took below and because he has otherwise waived the claim, including through failing to raise the issue in his posttrial motion. We agree

1-04-1852

with the State that defendant has waived the issue.[3]

The court looked to the parties for guidance as to whether polling of the jury would be required to purge any taint of Uriaus' communicating his experience with defendant to his fellow jurors on the night the incident came to its attention. The defense and the State agreed to delay any determination until the following morning. On returning to court the following day, after having had the evening in which to weigh their options, the defense elected to make a response of "no response" to the State's request for polling of the jury. Defendant currently contends that we cannot conclude that he waived his claim because "no response" is equally capable of being interpreted as an implicit joining in of the State's request as it is a statement in opposition. We, however, disagree.

Leading up to defendant's "no response," the State and the court itself were the only entities that ever explicitly addressed polling the jury surrounding the alleged communication by defendant. Defendant, on the other hand, only specifically requested further questioning of Uriaus. Moreover, following defendant's "no response," the court specifically stated that it was

---

[3] Defendant further contends that the circuit court erred by failing to look into what discussions the jurors were having among themselves when Uriaus informed the court of "talk previous to this incident this evening." However, defendant never develops this argument. In particular, he never cites to any authority explaining how the circuit court is to respond to such information. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001.

"going to deny the State's request." By the court's reference to "the State's request" in its ruling, defendant would have recognized that the court did not view him as joining the State's motion, and he should have clearly made a request at that time if he actually desired polling of the jury. The defense should have recognized that the court would not readily deny a joint motion by both parties as it might deny a motion made only by the State. This is particularly true where the State's request could have had potentially negative consequences for defendant's position, which the circuit court recognized and articulated in its denial of that motion. By not making a specific request at that point, defendant did not afford the circuit court the opportunity to correct any error that might have occurred, and, of course, affording the circuit court such an opportunity is one of the bases underlying the waiver rule.

In our view, defendant's conduct in this case is identical to that described by the Second Circuit as an example of waiver in this context in United States v. Gersh, 328 F.2d 460 (2d Cir. 1964) when it stated the "argument [for waiver] would indeed [have] be[en] persuasive if defense counsel had known of the incident [of outside contact] before the case was submitted to the jury or while it was deliberating, but had nevertheless stood mute, gambling on an acquittal while holding this issue in reserve." Gersh, 328 F.2d at 463. See also United States v. Shakur, 723 F.Supp 925, 932-33 (S.D.N.Y. 1988) ("A defendant may waive his right to complain of prejudicial outside influence upon the jury if, knowing of that influence, he or his counsel ' "nevertheless stood mute, gambling on an acquittal while holding this issue in reserve" ' [Citations.] This may be regarded as waiver by deliberate concealment").

Moreover, the Gersh court ultimately declined its defendants' requested relief because the

1-04-1852

defendants, even at the time of their posttrial motion, failed to request the appropriate remedy of a hearing to determine the facts surrounding the contact and to afford the government the opportunity to show such contact to be harmless. Gersh, 328 F.2d at 463-64. The court explained:

"Save when the conceded facts as to outside contact with a juror conclusively show prejudice, the court is not bound to order a new trial but rather to conduct a hearing in which the facts can be established, with the Government having the burden of showing that any such contact 'was harmless to the defendant.' [Citations.] If a request for such a hearing had been made, it should have been granted. But defense counsel never made such a request; their motion *** was not for a hearing, which, so far as appears, would still have been entirely practicable and which the judge might well have directed had he been asked. Instead they sought a new trial because of his previous failure to hold a hearing, an error which counsel chose to regard as beyond correction." Gersh, 328 F.2d at 464.

So too here, defendant failed to seek a posttrial hearing in the circuit court and continues to inappropriately ask for a new trial rather than a hearing so as to deny the State the opportunity to show the harmlessness of any contact.

Nevertheless, in spite of his procedural forfeitures and insufficiencies, defendant asks for us to review for plain error. Even granting this review, however, can provide no relief for defendant.

-21-

1-04-1852

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *** In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." People v. Herron, 215 Ill. 2d 167, 186-87 (2005).

Thus, "Herron's two prongs establish two categories of plain error: prejudicial errors, which may have affected the outcome in a closely balanced case, and presumptively prejudicial errors, which must be remedied although they may not have affected the outcome." People v. Nitz, 219 Ill. 2d 400, 415 (2006). Defendant contends that he is entitled to relief under both prongs. We, however, disagree since, to begin, we can find no error that is plain.

"The trial court has substantial discretion in determining whether an improper contact with a juror has caused prejudice to the defendant" (People v. Harris, 123 Ill. 2d 113, 132 (1988)), and in fashioning the means to investigate improper contact (see United States v. Williams-Davis, 90 F.3d 490, 498-99 (D.C. Cir. 1996) ("the trial court has broad discretion over the 'methodology' of inquiries into third-party contacts with jurors. [Citation.] We have explicitly

-22-

rejected any automatic rule that jurors are to be individually questioned"); United States v. Khoury, 539 F.2d 441, 443 (5th Cir. 1976)). As the court in United States v. Chiantese, 582 F.2d 974, 980 (5th Cir. 1978), explained:

> "In determining whether to conduct a hearing in a case such as this, the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct. We as an appellate tribunal, are in a poor position to evaluate these competing considerations; we have only an insentient record before us. The trial court is in a far better position to judge the mood at trial and the predilections of the jury. The trial court, therefore, must enjoy a broad discretion in these matters."

"A court only abuses its discretion when it 'act[s] arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed[s] the bounds of reason and ignore[s] recognized principles of law' [citation], so that 'no reasonable person would take the view adopted by it' [citation]." People v. Rojas, 359 Ill. App. 3d 392, 401 (2005).

In this case, the circuit court took the necessary step of questioning Uriaus to ensure his ability to remain fair and impartial since he indicated that he had become uncomfortable based on what he perceived to be defendant's attempt to communicate with him. In declining to investigate further, by conducting *voir dire* of the remaining jurors who may have heard Uriaus describe defendant's alleged communication, the court made a judgment that such an

investigation would be more detrimental to defendant than allowing the issue to go unexplored. This concern was bolstered by the fact, as discussed above, that the defense remained silent rather than joining or concurring of record in the State's jury-polling demand. We cannot say that this judgment was unconscientious or beyond the bounds of reason. As the circuit court explained, conducting *voir dire* of the remaining jurors would have acknowledged and accentuated the communication as an established fact detrimental to the defense and emphasized defendant's alleged communication as misconduct.

Defendant contends, however, that further inquiry was required under our supreme court's decision in People v. Roberts, 214 Ill. 2d 106 (2005), and that the circuit court's decision was therefore made in ignorance of established legal principles. But, we disagree.

In Roberts, a juror met and spoke with one Phillips outside of the courthouse, unaware that Phillips would be a witness in the defendant's case. The juror was "shocked" when Phillips was called to testify. The juror perceived that Phillips kept looking at her during his testimony and she became nervous. After Phillips' testimony, the other women on the jury asked the juror about her nervous appearance and she related her experience with Phillips to all of the other women on the jury. Later, during deliberations, other jury members told the juror that she should inform the judge of her contact with the witness. The jury sent the judge a note regarding the juror's contact with Phillips two hours after deliberations began. Called before the court in response to the note, the juror described her contact with Phillips to the court and disclosed that she related that experience to the other women of the jury; she further informed the court that she could no longer be fair and impartial. The court dismissed the juror and questioned the

-24-

remaining 11 jurors, 10 of whom had become aware of the juror's contact with the witness.  All 10 who were aware of Phillips contact told the court that they did not believe Phillips had, in fact, threatened the excused juror, and all 11 affirmed that they could remain fair and impartial.  The court recalled a woman who had served as an alternate juror and questioned her about whether she had discussed the case with anyone and if she had formed an opinion about the case.  The court did not, however, inquire of the alternate juror if she was made aware of the excused juror's contact with Phillips.  The circuit court then instructed the new group of 12 jurors to begin their deliberations afresh.  Roberts, 214 Ill. 2d at 111-13.

In addressing the substitution of the excused juror, our supreme court concluded:

> "Given the facts of this case, we find defendant was prejudiced by the replacement of the excused juror with the alternate juror.  First, according to the excused juror, all of the other female jurors were informed the day before deliberations began of her contact with Phillips.  Based on that statement, we must conclude the female alternate juror knew of the contact between the excused juror and Phillips because the alternate juror was not excused from the jury until the case was submitted for deliberations.  The alternate juror was not, however, questioned about her knowledge of the contact between the excused juror and Philips when she was recalled to serve on the jury.  Therefore, the court did not ensure the alternate juror was not biased due to outside influence." Roberts, 214 Ill. 2d at 124.

We find Roberts eminently distinguishable from the present case. To begin, in Roberts, the juror with whom the outside contact occurred admitted that, as a result, she lost her ability to remain impartial and, therefore, had to be excused from further jury service. Moreover, that juror clearly expressed her sense of intimidation to her fellow jurors, starting with her apparent unease, which led her fellow jurors to inquire about what was bothering her. In this case, however, Uriaus stated that he was not adversely impacted by defendant's alleged communication. Further, the circuit court, here, specifically concluded that defendant's communication, if it actually occurred, was not intimidating or threatening in nature and found no reason to excuse Uriaus. Secondly, whereas, as we have discussed above, the circuit court in this case made a reasoned decision in opting not to *voir dire* the remainder of the jury in order to avoid emphasizing and accentuating that incident, in Roberts there appeared to have been no apparent reason not to question the recalled alternate juror when that circuit court had already questioned all remaining 11 jurors about the outside contact.

The case of People v. Williams, 344 Ill. App. 3d 334 (2003), is more analogous. In that case, one juror received a call on the first night of trial from the county jail. The juror related to the circuit court that this contact made her uncomfortable and that she could no longer be impartial. She also reported that other jurors had become uncomfortable when spectators in the courtroom stared at the jury as it left the courtroom. The circuit court excused this juror, but elected not to *voir dire* the remainder of the jury because it was concerned that the jurors would then conclude that their colleague's

dismissal was related to the spectators' conduct, rather than on account of the phone call that only she experienced and knew about. Williams, 344 Ill. App. 3d at 336. At the hearing on the defendant's posttrial motion, the circuit court maintained the correctness of its decision, "noting that [it] had personally observed the demeanor of the spectators in the courtroom and noted no behavior that would give rise to a need for an inquiry into jury intimidation." Williams, 344 Ill. App. 3d at 337. On appeal, the Williams court affirmed the circuit court's refusal to question the remaining jurors, holding:

> "[T]here was no credible evidence to conclude that any of the other jurors were fearful or intimidated by the spectators staring at those jurors as they left the courtroom. Indeed, the dismissed juror's observation that some of the jurors felt 'uncomfortable' fails to rise beyond the level of mere suspicion of impartiality, which is insufficient where the burden is upon the defendant to show that a jury was tainted." Williams, 344 Ill. App. 3d at 337.

Here, as in Williams, the circuit court made a personal observation of the actions of the persons in the courtroom and determined that no intimidating conduct took place. Further, in light of the nonintimidating nature of defendant's alleged communication, here, also as in Williams, we can only find the creation of a "suspicion of impartiality," insufficient to warrant any relief to defendant. See Williams, 344 Ill. App. 3d at 337.

With respect to the second prong of plain error, defendant would appear to rely on presumptions of prejudice and the lack of a fair trial where there is any outside influence on a

jury. In support of the existence of these presumptions, defendant cites to People v. Mitchell, 152 Ill. 2d 274, 341 (1992), which quoted People v. Harris, 123 Ill. 2d 113, 132 (1988), for the proposition that " '[i]t is well settled in Illinois that any communication with a juror during trial about a matter pending before the jury is deemed presumptively prejudicial to a defendant's right to a fair trial.' " In rendering this statement of law, the Harris court relied on the United States Supreme Court case of United States v. Remmer, 347 U.S. 227, 229, 98 L. Ed. 654, 656, 74 S. Ct. 450, 451 (1954), which stated:

> "In a criminal case, any private communication, contact, or tampering,
> directly or indirectly, with a juror during a trial about the matter pending
> before the jury is, for obvious reasons, deemed presumptively prejudicial,
> if not made in pursuance of known rules of the court and the instructions
> and directions of the court made during the trial, with full knowledge of
> the parties."

Accord Mattox v.United States , 146 U.S. 140, 150, 36 L.Ed. 917, 921, 13 S. Ct. 50, 53 (1892) ("Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear").

The United States Supreme Court later possibly appeared to retreat from its position in Remmer, however. In Smith v. Phillips, 455 U.S. 209, 215, 71 L. Ed. 2d 78, 85, 102 S. Ct. 940, 945 (1982), in a case where a juror submitted an employment application to the prosecutor's office while serving as a juror, the court stated "the remedy for allegations of juror partiality is a

-28-

hearing in which the defendant has the opportunity to prove actual bias."  Later, in United States v. Olano, 507 U.S. 725, 738, 123 L. Ed. 2d 508, 522, 113 S. Ct. 1770, 1780 (1993), the court stated:  "We generally have analyzed outside intrusions upon the jury for prejudicial impact." The Olano Court then went on to say, after citing Smith: "There may be cases where an intrusion should be presumed prejudicial [citations], but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?"  Olano, 507 U.S. at 739, 123 L. Ed. 2d at 522, 113 S. Ct. at 1780.

The federal circuits are divided as to the effect of Smith and Olano on the ongoing vitality of the Remmer presumption.  Several circuits interpret Smith and Olano as abolishing the presumption established in Remmer.  See United States v. Sylvester, 143 F.3d 923, 934 (5th Cir. 1998) ("We agree that the Remmer presumption of prejudice cannot survive Phillips and Olano. Accordingly, the trial court must first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence"); Williams-Davis, 90 F.3d at 496 (stating, in discussing the significance of Smith, "But assuring the defendant 'an opportunity to prove actual bias' is out of synch with the Remmer presumption; why would a defendant enjoying a presumption in his favor need such an opportunity?"); United States v. Pennell, 737 F.2d 521, 532 (6th Cir. 1984) ("In light of Phillips, the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality.  Prejudice is not to be presumed").  However, not all of the circuits have reached that conclusion.  See United States v. Dutkel, 192 F.3d 893 (9th Cir.

1999); United States v. Tucker, 137 F.3d 1016, 1030 (8th Cir. 1998); United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996). But, even those circuits that recognize Remmer as having ongoing vitality appear to still draw a distinction between contacts tantamount to jury tampering and those of a more innocuous nature; attempts at tampering are still presumed prejudicial, whereas innocuous contacts are not. See Dutkel, 192 F.3d at 895 ("The government argues that the categorical directive of Remmer has been undermined by subsequent cases which empower the district court to shift the burden of showing prejudice to the defendant. The cases on which the government relies do nothing of the sort, as none involved jury tampering as that term is normally understood: an effort to influence the jury's verdict by threatening or offering inducements to one or more of the jurors. *** Jury tampering is a much more serious intrusion into the jury's processes and poses an inherently greater risk to the integrity of the verdict. While we presume that jurors will disregard the advice of friends and ignore other *ex parte* contacts, we can indulge no such presumption where jury tampering is involved"); Tucker, 137 F.3d at 1030 ("We do not have sufficient facts before us to ascertain whether the presumption of prejudice should apply, since [the] affidavit does not reiterate the substance of the alleged communications between [the juror] and [the outsider]. However, the type of contact suggested by the record is neither outside legal advice nor exposure to extraneous facts, but private communication, contact or tampering. Tampering was exactly the sort of contact involved in Remmer I, in which the Supreme Court stated the presumption rule"); Cheek, 94 F.3d at 141 ("If the party attacking the verdict introduces competent evidence of extrajudicial juror contacts, the court must analyze whether the contacts were 'more than innocuous interventions that simply could not justify a

presumption of prejudicial effect.' [Citation.] But if a contact or communication 'cannot be characterized as innocuous [the court] must proceed from the presumption of prejudice.' [Citation.]").

Most recently, the Seventh Circuit, too, has rejected that Remmer created a categorical presumption in Wisehart v. Davis, 408 F.3d 321, 326 (7th Cir. 2005) ("Ripped from its context, the statement is difficult to take seriously, because it is so easy to imagine situations in which a 'private communication ... with a juror during a trial about the matter pending before the jury' would not create a rational presumption of prejudice"). The Wishehart court went on to explain:

> "In short *** the extraneous communication to the juror must be of
> a character that creates a reasonable suspicion that further inquiry is
> necessary to determine whether the defendant was deprived of his right to
> an impartial jury. How much inquiry is necessary (perhaps very little, or
> even none) depends on how likely was the extraneous communication to
> contaminate the jury's deliberations." Davis, 408 F.3d at 326.

For a time, Illinois seemed to acknowledge a categorical presumption in accord with the literal language of Remmer. For example, in Mitchell, a case succeeding Smith by a decade, our supreme court quoted its decision in Harris for the existence of the presumption of prejudice from outside contact which had, as noted, relied on Remmer. Moreover, defendant presents Illinois cases from as recently as 1999 that continued to extol the unqualified existence of the presumption. See People v. Burns, 304 Ill. App. 3d 1, 6 (1999). However, more recently, our supreme court appeared to shift toward a more fact-intensive, case-specific analysis in People v.

1-04-1852

<u>Williams</u>, 209 Ill. 2d 227 (2004).

In <u>Williams</u>, a defendant seeking postconviction relief presented the affidavit of a juror who averred that another juror "mentioned that she 'had a conversation' with her husband about one of the issues in the case. When a third juror commented that they had been instructed not to discuss the case with others, she responded that it was 'hard not to.' " <u>Williams</u>, 209 Ill. 2d at 234. The <u>Williams</u> defendant contended he was entitled to an evidentiary hearing because of the presumption of prejudice established in <u>Mitchell</u> and later applied in <u>People v. Hobley</u>, 182 Ill. 2d 404 (1998). Our supreme court disagreed, however, stating, "The lesson of <u>Hobley</u> is that a juror affidavit alleging exposure to '*prejudicial* outside influences' (emphasis added) [citation] is sufficient to raise a presumption of prejudice and to shift the burden to the State to establish that such contacts were harmless." <u>Williams</u>, 209 Ill. 2d at 241. The <u>Williams</u> court then went on to explain, in rejecting postconviction relief:

"The *** affidavit contains nothing more than the mere assertion

that an improper conversation occurred. The affidavit contains no

information about the nature of the conversation. That is, it offers no

evidence that the alleged conversation was prejudicial in any respect.

Indeed, the juror may have been the one doing the talking while her

husband simply listened. The husband may have made remarks that were

critical of the judge or of the prosecution. The 'issue' discussed may have

been the decision not to sequester the jury or how long the proceedings

should go on each day. In sum the *** affidavit establishes only that a

-32-

member of the jury was having difficulty overcoming the temptation to discuss the case with her husband. It does not establish that the improper conversation was prejudicial in nature." Williams, 209 Ill. 2d at 241-42.

Thus, since Illinois no longer appears to categorically presume prejudice when there is outside contact with a juror, defendant in this case may not obtain relief under Herron's second prong of plain error, as elucidated by Nitz, based on a categorical presumption. Moreover, there appears to be no reason to presume prejudice based on the nature of the communication. Defendant's attempted communication with the jury here is better described as innocuous than tampering. Defendant's plea, which consisted of him mouthing the words "don't do it," did not necessarily explicitly or implicitly threaten or menace Uriaus. Further, unlike a bribe or threat, defendant's communication did not inherently suggest his guilt of the offense for which he was being tried; in fact, his plea, "don't do it," could be viewed as being entirely consistent with innocence.

More overridingly, any presumption should not apply when a defendant initiates the contact himself, in this case through defendant's misconduct in attempting to communicate with a juror, albeit silently and in open court. In fact, some cases, addressing defendants' outbursts in open court, have so held. See United States v. Harris, 2 F.3d 1452, 1456 (7th Cir. 1993) (stating, regarding an outburst before the jury, " '[t]o allow a defendant by his own misconduct to terminate his trial even temporarily would be to allow him to profit from his own wrong.' [Citation.]"); Reynolds v. State, 625 N.E.2d 1319, 1321 (Ind. App. 1994) ("A defendant who creates his own cause for mistrial presents no error"); Winston v. Commonwealth, 12 Va. App.

-33-

363, 370, 404 S.E.2d 239, 243 (1991) (" '[C]ourts have frequently explained their reluctance to consider the disruptive conduct of a defendant to be a proper ground for a mistrial, as being necessitated by the possible consequences of a contrary holding. To hold that the disruptive conduct of a defendant is a proper ground for a mistrial, it has been said, would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so.' [Citation.]").

We acknowledge that these considerations may not apply in situations where the defendant's conduct is so egregious that the fairness of the trial is necessarily, irrevocably undermined. For example, the Fifth Circuit, in reversing for a new trial where the defendant attempted to have a friend persuade a relative sitting on the jury to vote in the defendant's favor, held:

"It makes no difference in this case that it was [the defendant] himself who initiated the contact that may have poisoned the jury. We reject the suggestion that [the defendant] may not be heard here to complain of the results of his own misconduct. He has been convicted of jury tampering and for that misconduct is subject to punishment. That is an entirely discrete matter. At issue in his trial in this case was whether [the defendant] had dealt with stolen goods, not whether he had tried to corrupt the judicial system. A fair and impartial jury cannot be permitted to draw the conclusion that, because a defendant attempted to fix his trial, he is guilty of the offense for which he is being tried. It is conceivable that

1-04-1852

a defendant, innocent of the charge being tried, might attempt to tamper

with a jury to assure a favorable verdict."  United States v. Forrest, 620

F.2d 446, 458 (5th Cir. 1980).

Our supreme court subsequently quoted Forrest in People v. Hawkins, 181 Ill. 2d 41, 56-59

(1998), while rejecting the State's claim that the defendants should not be able to claim that they

were deprived of a fair trial on the bases of unclean hands and injected error.  See Hawkins, 181

Ill. 2d at 57 ("That defendants may have contributed to the corruption of an impartial fact finder

is immaterial to our immediate inquiry of whether they were denied a fair trial.").  However, that

case involved the significantly more egregious facts of a codefendant attempting to bribe the trial

judge and the trial judge subsequently attempting to renege on the previously agreed upon fix

because he perceived himself to be under scrutiny from law enforcement.  Hawkins, 181 Ill. 2d at

45-48.

Here, on the other hand, the circuit court determined that defendant's communication was

not intimidating in nature.  In fact, in our view, defendant's statement can be viewed simply as a

supplication, little different in substance from what his attorney had already asked from the jury.

We would, thus, perceive no manifest injustice in precluding defendant's claim on the basis of

injected error under these facts.

## II.  Motion to Suppress

Defendant argues that the circuit court should have granted his motion to suppress

because the evidence of his arrest for possession of a controlled substance was too old or "stale"

to indicate any criminal activity at the time of the search.  Defendant also appears to contend that

the notification by the Harvey police that he was involved in a shooting could not have been sufficient to formulate reasonable suspicion of wrongdoing. The State, on the other hand, contends that the information surrounding the shooting, in and of itself, was sufficient to form reasonable suspicion for the search, especially when combined with defendant's flight from Giorgakis and White when they reported to his home. Likewise, the State does not concede that any staleness of the drug arrest would have precluded the search.

Normally, for the search of a home to be reasonable, the police must have obtained a warrant supported by probable cause. See Griffin v. Wisconsin, 483 U.S. 868, 873, 97 L. Ed. 2d 709, 717, 107 S. Ct. 3164, 3168 (1987); see also Payton v. New York, 445 U.S. 573, 589, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1381-82 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home"). However, the warrant requirement has been relaxed in cases involving parolees, probationers, and persons subject to supervised release.

Generally speaking, "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' [Citation.]" United States v. Knights, 534 U.S. 112, 118-19, 151 L. Ed. 2d 497, 505, 122 S. Ct. 587, 591 (2001). "Reasonableness is measured in objective terms by examining the totality of the circumstances." People v. Moss, 217 Ill. 2d 511, 518 (2005). Accord Green v. Butler, 420 F.3d 689, 694 (7th Cir. 2005) ("The touchstone of

Fourth Amendment inquiry is reasonableness, \*\*\* a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest").

The United States Supreme Court has also recognized that an individual's status as a person subject to mandatory supervised release is a "salient circumstance" on both sides of the general balancing test. See Knights, 534 U.S. at 118-19, 151 L. Ed. 2d at 504-05, 122 S. Ct. at 591. The degree of intrusion is less since there is a diminished individual expectation of privacy inherent in the status of probationer/parolee, especially since terms addressing searches are usually contained in the probation/parole conditions. See Knights, 534 U.S. at 119, 151 L. Ed. 2d at 505, 122 S. Ct. at 591 ("Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled. " ' [Citation.]"); People v. Wilson, 364 Ill. App. 3d 762, 770 (2006) ("Those offenders on MSR have a significantly reduced expectation of privacy compared to ordinary citizens because they are criminal offenders subject to a prison term and are subject to certain restrictions as a condition of their release"). The precise provisions of any search conditions necessarily also affect the balance by further shaping the legitimate expectations of privacy of the individual. See Samson v. California, 547 U.S. __, __, 165 L. Ed. 2d 250, __, 126 S. Ct. 2193, 2199 (2006) (holding that a parolee subject to a search condition requiring every parolee to agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time, with or without a search warrant and with or without cause, "did not have an expectation of privacy that society would recognize as

legitimate"); Moss, 217 Ill. 2d at 531 ("The search condition of defendant's MSR further diminishes that already reduced expectation of privacy"); People v. Lampitok, 207 Ill. 2d 231, 251 (2003) ("Because Bircher agreed to a more limited probation search condition than Knights, her expectation of privacy was not as diminished, and more individualized suspicion was required by the fourth amendment than would have been required for Knights"); Wilson, 364 Ill. App. 3d at 770 ("The breadth of a search condition affects a defendant's expectation of privacy"); People v. Flagg, 217 Ill. App. 3d 655 (1991) (invalidating the search of a parolee where there was no search condition among his parole conditions).

On the other side of the balance considering legitimate governmental interests, there is a significant interest in protecting the public from persons under supervision, who are more likely to recidivate. See People v. Moss, 217 Ill. 2d at 531 ("The defendant's MSR status also contributed to that interest. The state is justified in focusing greater attention on probationers because of their higher likelihood of recidivism. [Citations.] Persons on MSR, even more than probationers, present a risk to the public").

The United States Supreme Court has also recognized a second basis for loosening the warrant requirement for parolees and probationers when the government presents "special needs," beyond normal law enforcement. See Griffin, 483 U.S. at 873-74, 97 L. Ed. 2d at 717, 107 S. Ct. at 3168. As our supreme court explained, the United States Supreme Court recognizes the existence of such special needs in probation systems containing extensive regulations surrounding probation/parole searches. See People v. Lampitok, 207 Ill. 2d 231, 246 (2003) ("The [Griffin] court *** emphasized the narrowness of its holding by specifying that this

probation search was reasonable under the fourth amendment because it was conducted in compliance with a valid regulation permitting warrantless probation searches upon 'reasonable grounds,' a standard which the Wisconsin Supreme Court found had been met. [Citation.]"). However, there is still some overlap in considerations under this exception to the warrant requirement as under the traditional totality of the circumstances/balancing test. For example, the Griffin court observed that some of the special needs in administering Wisconsin's regulated probation system included protecting the public and the need to successfully reintegrate ex-offenders into society. Griffin, 483 U.S. at 875, 97 L. Ed. 2d at 718-19, 107 S. Ct. at 3169.

In this case, there appears to be no basis on which to consider the "special needs" of the State since there is no elaborate regulatory structure addressing MSR searches in Illinois compared to those applicable in Griffin. See Lampitok, 207 Ill. 2d at 246 ("Probation searches in Illinois are not subject to regulations comparable to those in Wisconsin that were discussed in Griffin. [Citation.] Bircher's probation search condition itself does not mention 'reasonable grounds' or any other standard of suspicion needed to justify a search"); Flagg, 217 Ill. App. 3d at 657 ("Griffin is distinguishable because Wisconsin's parole regulations expressly permit a warrantless search of a probationer's home"). In fact, at the time when defendant was placed on MSR, and at the time of the search of defendant's room, the Unified Code of Corrections merely mandated that each term of MSR contain a condition that "the subject" "permit the agent to visit him at his home or elsewhere to the extent necessary to discharge his duties." 730 ILCS 5/3-3-7(a)(6) (West 1998). Moreover, the circuit court determined below that the participation of the parole agents was merely a pretext, that the true purpose of the search was to assist the Harvey

Police Department in its investigation of a known crime, a normal part of law enforcement, not a special need. See Moss, 217 Ill. 2d at 526 ("The special needs of the state's MSR program are not at issue because the search of defendant was not performed for any supervisory purpose. [Citation.] Instead, [officers] acted pursuant to their ordinary law enforcement responsibilities"). However, we may still consider whether the search of defendant's home was reasonable under the totality of the circumstances test and the balancing of government and individual privacy interests in the present case. See Moss, 217 Ill. 2d at 526 ("Lacking a special need similar to the one found in Griffin, our analysis utilizes the totality of the circumstances test applied in Knights").

Weighing in the government's favor, of course, is the fact that defendant was under MSR, which, as previously noted, inherently reduced any reasonable expectation of privacy he could have. Weighing in defendant's favor, however, are the facts that the search was of his home and, as noted above, that there was a lack of any specific search condition in his MSR conditions.

We note that the State incorrectly asserted at oral argument that subsection (a)(10) of section 3-3-7 of the Unified Code of Corrections (730 ILCS 5/3-3-7(a)(10) (West 2002)), which currently imposes as a mandatory condition of MSR that "the subject" "consent to a search of his or her person, property, or residence under his or her control," amounted to defendant's prospective consent to suspicionless searches in exchange for his release. However, that particular subsection did not become effective until January 1, 2002 (see Pub. Act. 92-460, eff. Jan. 1, 2002 (amending 730 ILCS 5/3-3-7)), subsequent to the commencement of defendant's term of MSR as well as the search at issue. Moreover, the appellate court has explicitly rejected

that MSR constitutes a negotiated release from incarceration.  See Wilson, 364 Ill. App. 3d at 766-67 ("the State asserts that defendant has 'negotiated his release from actual physical custody,' that without his prior agreement, he 'would not be released,' and that defendant was 'given the privilege of parole, something that is not mandatory.'  Rather, the Unified Code of Corrections provides that the MSR term is a mandatory component of defendant's sentence. *** Accordingly, the MSR term is not a negotiated release or a privilege.  Rather, it is a mandatory part of defendant's sentence").  Finally, our supreme court has held that an MSR supervisee's consent to search is still required even under the current language. Moss, 217 Ill. 2d at 525-26 (stating, in addressing the current section, "Although defendant's condition allows for a greater variety of searchers and searches, it still requires that he give his consent to each search before it is conducted. ***  We hold that the search condition of defendant's MSR does not establish prospective consent to all searches").

We are likewise unpersuaded by the State's reliance on Giorgakis's testimony, in which he stated what he perceived his search powers to be, as proof that defendant was subject as a general MSR condition to "random compliance checks," including searches.  As we have demonstrated, the terms of MSR are primarily regulated by statute and an individual officer's perceptions of the scope of his authority are, therefore, irrelevant and, as in this case, may prove to be wrong.  See United States v. Payne, 181 F.3d 781 (6th Cir. 1999) (suppressing the fruits of a search where parole officers acted on their subjectively perceived general authority, but where the defendant's actual probation conditions gave the officers significantly less authority).

Specifically, then, turning to the actual MSR condition involved in this case requiring

"the subject" to "permit the agent to visit him at his home or elsewhere to the extent necessary to discharge his duties" (730 ILCS 5/3-3-7(a)(6) (West 1998)), we note that we could find no case holding that condition to authorize random or invasive searches and to, thereby, significantly diminish privacy interests. This court in People v. Haycraft, 349 Ill. App. 3d 416, 424-25 (2004), did hold that this condition justified the initial entry of a probation officer into her client's home. However, the subsequent search of the home and seizure of methamphetamines was justified on the basis that the drugs were in plain view, since the probation officer coincidentally visited while defendant was "cooking" the drug (Haycraft, 349 Ill. App. 3d at 424-25), and because the "volatile and combustible properties" of cooking methamphetamines created the need to "locate, dismantle, and take possession of the dangerous instrumentalities used *** [which] was an exigent circumstance that justified the warrantless search" (Haycraft, 349 Ill. App. 3d at 425). Previously, the Flagg court declined to "express [an] opinion whether this condition would carry with it the power to search or whether a search incident to such a condition would withstand the demands of the fourth amendment." Flagg, 217 Ill. App. 3d at 658 n. 1.

However, we observe that, even where the conditions for a search of a probationer/parolee/MSR supervisee were relatively more protective of privacy, and/or granted less authority to the State, courts have held that "reasonable suspicion" of wrongdoing is sufficient under the fourth amendment to justify such searches. See Lampitok, 207 Ill. 2d at 253 (after noting that its probationer's search condition was weaker than that in Knights, holding "Even though neither Bircher's probation order nor Illinois regulations imposed a reasonable suspicion requirement, the search can be valid under the fourth amendment if the officers

actually had reasonable suspicion of a probation violation supporting the probation search"). In fact, "reasonable suspicion" was held sufficient both under "special needs" analysis (Griffin, 483 U.S. at 875-76, 97 L. Ed. 2d at 719, 107 S. Ct. at 3169-70 ("We think it clear that the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds,' as defined by the Wisconsin Supreme Court")), as well as under the general balancing test (Knights, 534 U.S. at 121, 151 L. Ed. 2d at 506, 122 S. Ct. at 592 ("We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house")). The parties agree that this is the standard that we should apply.

Reasonable suspicion is a less exacting standard than probable cause. See People v. Scott, 249 Ill. App. 3d 597, 602 (1993). "Reasonable suspicion exists when 'articulable facts which, taken together with the rational inferences from those facts *** warrant a reasonably prudent officer' to investigate further." Lampitok, 207 Ill. 2d at 255, quoting Maryland v. Buie, 494 U.S. 325, 334, 108 L. Ed. 2d 276, 286, 110 S. Ct. 1093, 1098 (1990). "In evaluating whether reasonable suspicion exists, [a] court should consider the quality and content of information known to officers as well as the reliability of the source of the information." Lampitok, 207 Ill. 2d at 257. Other factors impacting on the existence of reasonable suspicion include the provision of details in a tip, the basis of knowledge in a tip, and little delay between the police receiving and acting on a tip. Lampitok, 207 Ill. 2d at 257. The "suspicion must be based at least in part on facts indicating possible present criminal activity." Lampitok, 207 Ill. 2d at 257. Information that is too stale may not serve as the basis for reasonable suspicion. See United States v. Payne,

1-04-1852

181 F.3d 781 (6th Cir. 1999); People v. Damian, 299 Ill. App. 3d 489 (1998).

As previously noted, defendant argues that the evidence of his drug arrest, occurring around seven months prior to the search, was too stale to allow the probation officers to have a reasonable suspicion that he possessed narcotics in violation of his MSR conditions. We agree. With respect to staleness, we note the similarity of the instant case to that in Payne, to which Lampitok cited. Lampitok, 207 Ill. 2d at 257. In Payne, a police officer transmitted an anonymous tip to a parole officer that the defendant possessed a large quantity of methamphetamines in the trunk of his car. However, the parole officer failed to act on the tip for over six weeks. Payne, 181 F.3d at 783-84. Noting that "[d]rugs are not the types of objects that are likely to be kept," and that "the tip contained no indication of ongoing activity," the Payne court held that "[e]ven if the tip had been somewhat reliable at the time [the police officer] received it, it was stale by the time of the search" and, thus, could not provide a basis for reasonable suspicion. Payne, 181 F.3d at 790. See also Damian, 299 Ill. App. 3d at 492 (stating that the "most important factor in determining whether the probable cause is 'stale' is the continuity of the offense" and holding that the conducting of one controlled drug buy, without any indication of an ongoing criminal enterprise, could not form probable cause for a search 1½ months later, since the evidence was then stale). So too, in this case, there was no evidence presented of any ongoing narcotic activity by defendant, and the lag in time in executing the search was even greater than in Payne and Damian.

We are further troubled by the lack of specificity in the Harvey police's tip to the parole officers, for purposes of finding reasonable suspicion. Although whoever identified defendant as

-44-

being involved in a shooting may have given Harvey police significant details of the event to suggest his reliability, or may have had a track record of reliability in providing the police with information, none of that kind of evidence came out at the hearing through Giorgakis, who was the only witness at the suppression hearing. Giorgakis's testimony surrounding the alleged shooting was so sparse, in fact, that one cannot know, from the testimony alone, that the shooting incident meant to justify the search was the same shooting at issue in this case.[4] We would, thus, be hard pressed to find that the tip could independently have allowed Giorgakis to have a reasonable suspicion that defendant violated his MSR conditions by possessing a firearm.

Nevertheless, we agree with the State that the tip coupled with defendant's flight upon seeing the officers was sufficient to create reasonable suspicion, and we therefore need not disturb the circuit court's determination on the motion. As the United States Supreme Court has explained, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. [Citations.] Headlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but is certainly suggestive of such." Illinois v. Wardlow, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000). Similarly, our supreme court in People v. Thomas, 198 Ill. 2d 103 (2001), held that police had reasonable suspicion to

---

[4] In so stating, we do not mean to intimate that sufficiently specific information of another shooting could not justify a search that would lead to the discovery of the gun used in the instant offense. We only mean to emphasize the scarcity of specific information presented at the hearing.

perform a <u>Terry</u> stop on a defendant when he broke into headlong flight, even though there was not enough reasonable suspicion to support the seizure the police had intended to perform immediately prior to the defendant's flight. So too, in this case, when defendant undertook such extreme measures to avoid Giorgakis and White, including taking them on a car chase and striking White, after seeing them *at his home*, we think the officers could reasonably have suspected that defendant possessed contraband in the home in violation of his MSR. Admittedly, this evidence of flight was not presented at the suppression hearing, but rather came out at trial, and was, thus, not relied on by the circuit court in reaching its ruling. However, we may review trial evidence in determining the propriety of a decision on a motion to suppress and affirm the decision on a suppression motion on any basis supported by the record. See <u>People v. Brooks</u>, 187 Ill. 2d 91, 127 (1999) ("When a reviewing court affirms a trial court's suppression ruling based on evidence that came out at trial, it is akin to a harmless error analysis. The reviewing court is essentially saying that whether the court's decision was supported by sufficient evidence at the suppression hearing becomes irrelevant when evidence to support the trial court's decision is introduced at trial. One reason this is so is that the pretrial ruling on a motion to suppress is not final and may be changed or reversed at any time prior to final judgment"); <u>People v. Sims</u>, 167 Ill. 2d 483, 500-01 (1995); <u>People v. LaBostrie</u>, 14 Ill. 2d 617, 620-21 (1958).

We further note, in the context of searches of homes of persons under some kind of postconviction supervision, courts have appeared to emphasize that the reasonable suspicion may be simply of the defendant's criminal wrongdoing or contact with contraband, without necessarily requiring suspicion that the situs of the wrongdoing was in the defendant's home, as exemplified

1-04-1852

by the myriad cases that have approved of home searches after a probationer's/parolee's/MSR supervisee's positive drug test. See, e.g., People v. Eiland, 217 Ill. App. 3d 250, 258-59 (1991) ("the probation officers had information from a police officer *** that defendant was committing a criminal offense ***. [Citation.] Additionally, the probation officers knew that two of defendant's urinalysis tests were positive for cocaine and cannabis. The search itself was therefore reasonable in that the information the probation officers possessed indicated the likelihood of facts justifying the search").

III. Sufficiency of the Evidence

Defendant next contends that the evidence of his identification as the shooter was vague and doubtful and could not constitute proof of his guilt beyond a reasonable doubt. Specifically, he contends that Coprich's identification could not suffice to provide a guilty verdict when he did not originally identify defendant as the shooter to Officer Hall and when Michael Walker identified another person as the shooter in a photo array. Defendant further argues that the evidence was insufficient to establish that he possessed the gun used in the shooting at the time of the shooting.

To determine whether sufficient evidence was presented to sustain a conviction, a reviewing court must consider all the evidence in the light most favorable to the State and then determine if a rational trier of fact could have concluded that the State proved the elements of the crime charged beyond a reasonable doubt. People v. Cox, 195 Ill. 2d 378, 387 (2001). Proof

-47-

beyond a reasonable doubt is not proof beyond any doubt. People v. Carroll, 278 Ill. App. 3d 464, 467 (1996). A reviewing court will not retry the defendant. People v. Green, 322 Ill. App. 3d 747, 754 (2001). Although the determinations of the trier of fact are not conclusive, they are entitled to great deference, so that a conviction will only be overturned where the evidence "is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of that defendant's guilt." People v. Ortiz, 196 Ill. 2d 236, 259 (2001).

The State must prove the identity of the person who committed the charged offense beyond a reasonable doubt. People v. Lewis, 165 Ill. 2d 305, 356 (1995). A single witness identification of the accused as the person committing the crime may be sufficient proof when the witness viewed him under circumstances permitting a positive identification. Lewis, 165 Ill. 2d at 356. But a conviction cannot stand when a witness's identification of the accused as the criminal perpetrator is vague and doubtful. People v. Ash, 102 Ill. 2d 485, 494 (1984).

In People v. Slim, our supreme court said that in assessing the reliability of identification testimony we should employ the factors set out in Neil v. Biggers, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), which include: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. People v. Slim, 127 Ill. 2d 302, 307-08 (1989). However, all circumstantial facts should be considered to determine the sufficiency of the identification. People v. Young, 269 Ill. App. 3d 120, 123 (1994).

1-04-1852

Defendant marginally employs the <u>Neil</u> factors in his argument.  He contends that Coprich had a poor opportunity to view the shooter because his sight line would have been partially blocked by his passenger.  However, he concedes that there was no testimony that there was someone in the passenger seat in Coprich's car, and that he is merely assuming the presence and effect of such a person based on the fact that there were four people in the car at the time.  He urges us to discount any certainty Coprich may have displayed at the lineup, citing to cases that have acknowledged psychological research finding no correlation between the certainty in and the accuracy of recollections.  See, <u>Krist v. Eli Lilly & Co.</u>, 897 F.2d 293, 296 (7th Cir. 1990); <u>United States v. Moore</u>, 786 F.2d 1308, 1312 (5th Cir. 1986).  But, he does not address our obligation to, nonetheless, consider this factor as a matter of *stare decisis*, nor does he address the fact that no expert testimony presenting these psychological findings to the jury was made in the court below.  See <u>People v. Curry</u>, 56 Ill. 2d 162, 170 (1973) ("one may not raise on appeal a question which was not properly presented to the trial court").  He does not appear to contend that any of the other <u>Neil</u> factors would militate in favor of reversal.

As defendant concedes, at base, his challenge is to the credibility of Coprich.  He contends that if Coprich's identification of defendant as the shooter is to be believed, then he must have lied to Officer Hall by only giving a description of "male Black, unknown height, unknown weight, unknown complexion," especially when, according to defendant, Coprich knew him.  At the very least, defendant asserts that, had he actually seen defendant commit the shooting, it would have been natural for Coprich to tell Hall that he had seen defendant earlier on, such as during the fight between defendant, Moten and Sakina.  The State, on the other hand,

-49-

argues that any inadequacy in Coprich's description of defendant merely went to the weight of the testimony to be considered by the jury and disputes that there is any evidence that Coprich knew defendant so as to make his failure to specifically identify defendant to Hall noteworthy.

In making his argument, defendant relies on the cases of People v. Charleston, 47 Ill. 2d 19 (1970) and People v. Hughes, 17 Ill. App. 3d 404 (1974).  In Charleston, our supreme court reversed a rape conviction for insufficiency of the evidence where the victim was able to look directly at her attacker's face during the rape, and gave a detailed description of her attacker to police, but did not inform the police that she had gone to school with him, knew his name, and knew him to be a friend of her husband, until trial.  Charleston, 47 Ill. 2d at 21-22.  Similarly, in Hughes, this court reversed a murder conviction where one witness knew the identity of the accused, but did not immediately disclose it to police, while another witness failed to inform police that he observed the accused in an altercation with the victim prior to the killing.  Hughes, 17 Ill. App. 3d at 410-11.  Hughes relied on the case of People v. King, 10 Ill. App. 3d 652, 655 (1973), which explained "that the failure to assert a fact when it would have been natural to assert it amounts in effect to an assertion of the non-existence of that fact. [Citation.]  The omission *** is *prima facie* inconsistent conduct which unexplained has the tendency to discredit a witness."  However, we find these cases unpersuasive in the case at bar.

We disagree with defendant that the record establishes that Coprich knew defendant's identity at the time he only gave a generalized description to police.  Defendant relies on the following colloquy in support of his interpretation of the facts:

"MS. COPPLESON [Assistant State's Attorney]: Did you see anyone in

that car at that time?

MR. COPRICH: Yes, him and another guy.

MS. COPPLESON: By him, do you mean the defendant?

MR. COPRICH: Yes, ma'am.

MS. COPPLESON: And did you later learn the defendant Wing to be the defendant Ward?

MR. COPRICH: Yes."

Defendant asserts that the preceding exchange shows that Coprich knew defendant by a nickname. However, the exchange never clarifies when Coprich became aware of defendant's identity; "later" could well have meant after Coprich initially spoke with the police. Moreover, it was only the assistant State's Attorney who referred to defendant as "Wing," never Coprich. Regarding any failure to mention the previous fight, in spite of Hughes, we do not consider any failure to mention that event as comparable in significance to failing to mention the known identity of the shooter. We do not see how it would necessarily be "natural" to mention that fact to an investigating officer when that information would not assist in tracking down the shooter. Moreover, Coprich testified to fully explaining the fight between defendant, Moten and Sakina less than two months after the shooting, when he observed the lineup, but that the assistant State's Attorney recording his statement failed to include anything other than details surrounding the shooting itself.

In our view, a rational jury could have credited Coprich's identification of defendant. As the State observes, Coprich displayed certainty in his identification of defendant at the time of

confrontation. Further, though Coprich's opportunity to view the shooter at the time of the shooting was short, it was facilitated by his close physical proximity to that person. Moreover, Coprich's identification of defendant as the shooter is strengthened by his having previously had the opportunity to view defendant in the preceding fight with Moten and Sakina. Since a jury could rationally have accepted Coprich's identification of defendant as the shooter, we need not concern ourselves with any potential infirmities in Walker's identification.

Finally, Coprich's identification was not the only evidence militating in favor of a finding that defendant was the shooter: there was the gun found in his safe. Defendant asserts that his later possession of the gun does not allow a rational inference that he possessed the gun on the day of the shooting. We, however, disagree. To begin, our supreme court refused to overturn a conviction for insufficient evidence where the defendant was found in possession of items recently stolen from a home and the murder weapon, recovered elsewhere, was also stolen from the home in the same burglary, a situation we view as parallel to that in the case at bar. See People v. Jones, 105 Ill. 2d 342, 349-50 (1985). Moreover, defendant's flight on the day of the search discovering the gun allows for an inference of his consciousness of guilt surrounding the use of the gun in the instant shooting.

## IV. Closing Arguments

As the case progressed toward trial, defendant filed a series of motions *in limine*. In one of these motions, defendant asked the circuit court "to bar the prosecution making any societal arguments and/or statements regarding the problems that guns play in our society." In argument before the circuit court, the defense explained that "the crux of our argument *** what I'm

seeking to exclude are any statements such as in opening or closing on how bad guns are to society *** therefore, you should convict Mr. Ward." The circuit court agreed that the State "should restrict *** argument to the facts in this case" and granted the motion.

In its opening statement, after suggesting that one of the shooting victims was rendered a paraplegic merely for wearing the wrong hat, the State contended to the jury that "this is a case about civilized society, human decency, and simple justice." Shortly thereafter, the State repeated this statement, except for replacing "human decency" with "human dignity." Once again, in closing argument, the State argued "this case is about simple justice, and then stated "It's about not allowing people to take justice into their own hands and do what they want because they have been wronged ***."

During its summation, the State further argued:

"On September 24th of 2000, Michael Walker did not get a judge to decide that being stuck in a wheelchair for the rest of his life was fair. And J.C. Johnson didn't get a jury to decide that standing unarmed in an alley made him worthy of killing.

No. What did these men get? These men got this guy over here, the defendant, William Ward, Judge, and jury."

Shortly thereafter, the State continued "ladies and gentlemen, the tables have turned, and William Ward is to be judged today. Judged by you, the voices of the community ***." Defendant objected to the State's reference to "voices of the community," and the circuit court sustained the objection.

Later, in its summation, in addressing Coprich's vague description of the shooter the State argued: "Terrance doesn't remember the conversation. Terrence can't tell you how long it lasted. Terrance can't tell you anything about it. And Terrance has to live in that community." Defendant then objected; the circuit court sustained the objection and admonished the jury "to disregard the State's Attorney's last statement, that he had to live within the community." When the State addressed Coprich's testimony in its rebuttal, the State argued: "[I]n a perfect world, you might have witnesses without any criminal convictions, but we don't live in a perfect world. We live in a world where Terrance Coprich lives with this defendant."

Earlier in its rebuttal, the State addressed the defense's reminder to the jury that it bore the burden of proof beyond a reasonable doubt as follows:

"One thing the defense attorney mentioned to you is our burden of proof. We are required to prove the defendant guilty beyond a reasonable doubt.

We are not required to prove the defendant guilty beyond all doubt, beyond a shadow of a doubt. As a matter of fact, you're not going to get an instruction that says the State must prove the defendant guilty beyond all doubt or a shadow of a doubt.

You will not get an instruction that the defendant must be proved beyond all doubt, that the State must present all sorts of evidence to prove him beyond all doubt. You will get an instruction that says, 'beyond a reasonable doubt.' And that's exactly what that means.

That's a burden that is met everyday in every courtroom. And we welcome that burden. In fact, the evidence in this case is overwhelming." Defendant objected to the State's comment on the weight of the evidence, but was overruled.

Finally, near the close of its rebuttal, the State argued: "Keep in mind, the defendant earned his seat at that table. The evidence proves that he earned his seat at that table. Remember something else. It isn't just the defendant's day in court. It's Michael Walker's and J.C. Johnson's day in court. They, too, are seeking justice."

Defendant contends that, by these arguments, the State improperly: focused the jury on societal problems rather than the individual determination of defendant's guilt; minimized its burden of proof; and inflamed the passions and prejudices of the jury.

The State, on the other hand, first contends that defendant has waived review with respect to the State's comments surrounding reasonable doubt; regarding the victims not receiving the benefit of a judge and jury where defendant took those roles on himself; and its comments surrounding the victims seeking justice in defendant's trial; and, finally, with respect to its comments on "civilized society," "human decency," "human dignity," and "simple justice." The State observes that there were no contemporaneous objections with those comments. The State rebuts defendant's claim that he did object to judge and jury comments by pointing out that defendant only specifically complained of the "voice of the community" reference at the end of the statement. The same is also true with respect to the State's preceding comments surrounding reasonable doubt, where defendant only specifically objected to its characterization of the evidence as "overwhelming" (which he does not challenge now). Finally, in any event, the State

argues that its closing arguments were proper. We agree with the State's waiver analysis. Further, with respect to the properly preserved contention surrounding the State's reference to the jury as the "voices of the community," we agree that there is no error, and regarding the State's first reference to Coprich "ha[ving] to live in [defendant's] community," we agree with the State that there is no prejudicial error.

Defendant cites to no Illinois precedents addressing the prosecution's address to the jury as voices of the community. However, the majority of our sister states find such address to be within the bounds of proper prosecutorial argument. See, e.g., State v. Nicholson, 355 N.C. 1, 44, 558 S.E.2d 109, 138 (2002) ("the state's characterization of the jury as the voice of the community counseled jury members to act in their appropriate role as ' "instruments of public justice" ' [Citations.]"); In the Matter of A.J.G., 131 S.W.3d 687, 693 (Tex. App. 2004) ("The statements about 'being a voice' and 'sending a message' did not pressure the jury to reach a guilty verdict based upon the demands, desires or expectations of the community and abandon consideration of the evidence. There was no implication that the community demanded a guilty verdict and the jurors had to acquiesce to these demands. Rather, the jury was asked to instruct or guide the community by its decision. Such argument is proper ***"); State v. Hughes, 908 S.W.2d 804, 807 (Mo. App. 1995); see also Kubisz v. Cadillac Gage Textron, Inc., 236 Mich. App. 629, 642, 601 N.W.2d 160, 167 (1999) (holding where the plaintiff in a personal injury case argued that the jury was the voice of the community in determining damages and deciding whether society would tolerate the defendant's failure to inform himself of OSHA regulations, "The 'voice of the community' reference did not 'appeal to the fears and prejudices of' the jury").

Surrounding the State's comments attempting to explain Coprich's vague description of the shooter by noting that he "has to live in that community [with defendant]," to which defendant objected, with the circuit court sustaining the objection, defendant concedes that, normally, the sustaining of an objection to an argument cures the error. See People v. Jones, 156 Ill. 2d 225, 244-45 (1993). However, defendant contends that curative effect of the sustaining of the objection was undone by the State's returning to the subject when it stated "in a perfect world, you might have witnesses without any criminal convictions, but we don't live in a perfect world. We live in a world where Terrance Coprich lives with this defendant." But, we disagree. In our view the latter comment is not a revisiting of the former.

The State's first comment was, in fact, an attack on defendant. That comment suggested that Coprich held back information from the police about the shooter because he feared defendant's retaliation for any cooperation with police when there was no supporting evidence to that effect. The second comment, on the other hand (like other well-known prosecutorial rhetorical devices such as that prosecutors "do not get to go to central casting" for their witnesses, or that "there are no swans in the sewer," or such as regrets for not being able to place a member of the clergy on the witness stand), can be interpreted not as an attack on defendant so much as an acknowledgment of the low character of the State's own witness. See State v. McCleese, 94 Conn. App. 510, 518-19, 892 A.2d 343, 349-50 (2006) (holding, in addressing a case in which the prosecutor argued, in part, " 'I don't have a busload of priests, ministers and rabbis who are out for a Sunday drive that day who could come in here and who you might find more believable. I brought before you the witnesses that we have' ": "The record reflects that the

prosecutor's reference to clergy, priests, ministers and rabbis was a rhetorical device used to acknowledge that the state's witnesses were fallible. *** That comment did not constitute misconduct"). Here, the State's argument can be construed as merely asking the jury not to presume Coprich to be lying on the basis of his checkered past since the kind of person likely to come into contact with someone who would engage in a drive-by shooting, and thus be able to testify against him, would probably not be a morally outstanding individual himself.

Moreover, even if the State were, in fact, making an underhanded attempt to revisit its first argument, we cannot conclude that the second comment, which was not objected to at trial, would have been sufficiently prejudicial to warrant reversal. If it were the State's intent to again raise the suggestion that Coprich felt threatened, it did so in an extremely veiled manner. While such an attempt would be egregious, the evidence, on the whole, was in favor of the State so that we cannot conclude that the removal of this comment alone would have produced a different verdict. Any improper circumvention of the circuit court's prior ruling on defendant's objection, while worthy of condemnation and sanction by the circuit court, would not, in and of itself, constitute reversible error. See People v. Vanda, 111 Ill. App. 3d 551, 559-61 (1982) (finding no reversible error by any violation of the circuit court's order granting a motion *in limine* where the evidence allegedly entered in violation of the order was actually admissible); see also State v. Plaskett, 271 Kan. 995, 1030-31, 27 P.3d 890, 913 (2001) (holding that only violations of granted motions *in limine* proven to be prejudicial required reversal); State v. Latham, 366 N.W.2d 181, 183 (Iowa 1985) (holding that a party may waive its opponent's violation of an order granting a motion *in limine*); 75 Am. Jur. 2d Trial §110 (1991) ("The sanction for violation

1-04-1852

of an order in limine is within the discretion of the trial court and under appropriate circumstances might extend to declaration of a mistrial and/or punishment for contempt").

We turn then to defendant's unpreserved claims and find that, even if we were to evaluate them notwithstanding waiver, that defendant could receive no relief for there either was no error or the error was not prejudicial. We also note that defendant has further waived all of these claims, with the exception of his challenge to the State's comments surrounding reasonable doubt, for failing to provide any specific authority addressing the propriety of the State's comments as would be required by Supreme Court Rule 341(e)(7) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001).

Regarding the State's comments that reasonable doubt did not mean "guilty beyond all doubt or a shadow of a doubt," and that it was "a burden that is met everyday in every courtroom," defendant cites to People v. Mena, 345 Ill. App. 3d 418 (2003), People v. Jones, 241 Ill. App. 3d 228 (1993), People v. Frazier, 107 Ill. App. 3d 1096 (1982), and People v. Martinez, 76 Ill. App. 3d 280 (1979), for the proposition that such statements are erroneous. However, we first observe that the watershed case in this line, Martinez, made this determination in a conclusory fashion, without any analysis or citation to supporting authority. Martinez, 76 Ill. App. 3d at 285. Moreover, we note that none of these cases have found such statements, standing alone, to be sufficiently prejudicial so as to warrant reversal. See Mena, 345 Ill. App. 3d at 427; Jones, 241 Ill. App. 3d at 234 ("Although the comments were improper, we do not believe they deprived defendant of a fair trial so as to invoke the plain error doctrine. The comments were not involved or likely to mislead the jury, nor did the trial court compound the

1-04-1852

error by giving an improper instruction"); Frazier, 107 Ill. App. 3d at 1101-02 (analyzing the prosecution's closing arguments in *dicta* since the court already determined that a remand was necessary on account of the improper admission of evidence); Martinez, 76 Ill. App. 3d at 283-85 (analyzing the prosecution's closing arguments in *dicta* since the court already determined that a remand was necessary on account of an improper jury instruction and where the court found additional improper closing arguments along with those surrounding reasonable doubt). The only other case on which defendant relies, People v. Starks, 116 Ill. App. 3d 384, 394-95 (1983), is readily distinguishable in that, in addition to making comments similar to those in the case at bar, the prosecutor went so far as to state " 'we don't have a burden, no matter what [defense counsel] would like you to think ***.' " Finally, and most importantly, we note that the vast majority of courts addressing comments like those here have found such comments to be proper, including our supreme court. See, e.g., People v. Kidd, 175 Ill. 2d 1, 40 (1996) (finding no error where the prosecutor argued that proof beyond a reasonable doubt " 'is a burden of proof that is met in courtrooms across this county and in this building each and every day' "); People v. Bryant, 94 Ill. 2d 514, 523 (1983); People v. Ligon, 365 Ill. App. 3d 109, 125 (2006) (finding no error where the prosecutor argued both that reasonable doubt did not mean " 'beyond all doubt' " and noted that that burden was " 'met every single day in courtrooms' "); People v. Norwood, 362 Ill. App. 3d 1121, 1136-38 (2005); People v. Baugh, 358 Ill. App. 3d 718, 742 (2005); People v. Carroll, 278 Ill. App. 3d 464, 467-68 (1996); People v. Guajardo, 262 Ill. App. 3d 747, 764-65 (1994); People v. Jennings, 142 Ill. App. 3d 1014, 1023 (1986); see also People v. Laugharn, 297 Ill. App. 3d 807, 812 (1998) ("The statements did not deprive defendant of a fair

trial or undermine the entire trial. The average jury understands the concept of reasonable doubt and is not contaminated when it hears the prosecutor say that *reasonable* doubt has *reason* behind it, and is an attainable standard, which incidentally, are accurate statements" (emphasis in the original)).

Regarding that portion of the State's argument surrounding "civilized society," "human decency," "simple justice," and "taking justice into his own hands," we observe that the Texas Court of Appeals has approved substantially similar comments. See Bryant v. State, 923 S.W.2d 199, 213 (Tex. App. 1996) ("the State's appeal to the jury that 'we must have rules of conduct' in a civilized society and its attempt to focus the jurors' attention on 'crime' or 'batterers' was a proper plea for law enforcement"); see also State v. Bryant, 337 N.C. 298, 313-14, 446 S.E.2d 71, 79-80 (1994) (holding that "the prosecutor's argument did not result in the jury being misled regarding its duty or the proper basis for its verdict" when the prosecutor still reminded the jury of the evidence, and the court instructed the jury to decide the case based on the evidence, where the prosecutor previously argued "Before we had *** a civilized society *** you wouldn't have a courtroom. It would be very simple. There [would] be a defendant, family of the deceased or friends of the deceased would determine who killed him and they would avenge the death. *** But now, we are civilized. The state stands in the place of the victim. And through this *** process, we act in the place of the victim"); State v. Bryant, 209 La. 918, 920, 25 So. 2d 814 (1946) (affirming where the prosecution argued, in part, "that no man has the right to take the law in his own hands"); Baird v. State, 179 Tenn. 444, 452, 167 S.W.2d 332, 335 (1943) ("We think it clearly appears that he was arguing that the purpose of the statute was to promote morality and

public decency, and we hold that it was not an improper argument"); but see Commonwealth v. Roberts, 433 Mass. 45, 54, 740 N.E.2d 176, 183 (2000) (holding "The prosecutor should not have asked the jury to convict the defendant in order to maintain an orderly society," and that "it is not permissible advocacy to ask the jury to hold a person accountable for 'taking the law into his own hands' because ours is a 'society governed by law' ").

Moreover, we do not credit defendant's argument that reversal is required because these arguments were in violation of the motion *in limine*, granted by the circuit court, for two reasons. To begin, the arguments were not in violation of the order granting the motion *in limine*. Defendant specified at the hearing on the motion that, by that motion, he only wanted "to exclude are any statements such as in opening or closing on how bad guns are to society *** therefore, you should convict Mr. Ward." The prosecutor's arguments made no reference to the scourge of gun violence. More importantly, the contention that an argument violated an order granting a motion *in limine* does not, in fact, address the necessary issue of whether the argument was actually proper or improper under the law. In other words, as previously noted, while a party's willfully ignoring a ruling on a motion *in limine* may very well be deserving of sanction by the circuit court, it does not necessarily follow that such action constitutes reversible error on appeal. See Vanda, 111 Ill. App. 3d at 559-61; Plaskett, 271 Kan. at 1030-31, 27 P.3d at 913; Latham, 366 N.W.2d at 183; 75 Am. Jur. 2d Trial §110 (1991).

The weight of authority again appears to be against defendant with respect to the State's comments that "Michael Walker did not get a judge to decide that being stuck in a wheelchair for the rest of his life was fair *** [and] J.C. Johnson didn't get a jury to decide that standing

unarmed in an alley made him worthy of killing" and that, instead, they "got this guy over here, the defendant, William Ward, Judge, and jury."  Courts have typically not found prosecutorial references to a defendant as taking on the role of judge and jury to be erroneous.  See, e.g., People v. Yeoman, 31 Cal. 4th 93, 145, 72 P.3d 1166, 1206-07 (2003) (finding no error in a prosecutor's reference to the defendant as the victim's judge, jury and executioner in a death penalty sentencing proceeding when "Nowhere in his closing argument did the prosecutor suggest, explicitly or implicitly, that the jurors should take lightly either the mitigating evidence or their duty to determine the appropriate penalty according to the law"); State v. Davis, 141 Wash.2d 798, 873, 10 P.3d 977, 1020 (2000) ("The prosecuting attorney's comment that Appellant acted as the 'judge, jury and executioner of the victim' did not constitute prosecutorial misconduct. *** There is nothing in the argument to indicate the comment was intended to inflame the jury"); Burns v. State, 729 So.2d 203, 227 (Miss. 1998) (holding prosecutor's referral to murder defendant as being the victim's "judge, his jury, and his executioner," was not reversible error when only referred to on one occasion); Hutcherson v. State, 727 So.2d 846, 856-57 (Ala. Crim. App. 1997) (stating in addressing the prosecutor's comment that the defendant "is getting the benefit of a trial by y'all.  That is not something that he gave Thelma Gray that night," "We find these remarks to be a call for justice and not a call for sympathy as the appellant contends"); State v. Walls, 342 N.C. 1, 64, 463 S.E.2d 738, 772 (1995) ("Defendant next contends that the prosecutor improperly suggested to the jury that defendant was not entitled to constitutional protections when the prosecutor noted that [the victims] had no lawyer, no jury, no bailiff, no judge and no legal rights.  We do not read into the prosecutor's argument that it was an

attack on defendant's exercise of his constitutional rights. The prosecutor merely argued to the jury that defendant, as judge, jury and executioner, single-handedly decided [the victim's] fate"); Leutner v. State, 235 Ga. 77, 84, 218 S.E.2d 820, 826 (1975) (holding the prosecution's reference to the defendant as acting as judge, jury and executioner "in evidence or a fair comment thereon. There was evidence from which the conclusion could be drawn that the appellant by taking a loaded pistol, hunting out the deceased, questioning him with a loaded cocked pistol at his head, and shooting him through the head killing him had indeed pre-empted the judicial process to recover his drugs"); State v. Varice, 292 So.2d 703, 705 (La. 1974); but see People v. Crossno, 93 Ill. App. 3d 808, 824 (1981) (holding the prosecutor's comment that the defendant served as the victim's judge, jury and executioner to be improper when the State never contended that the defendant intended to kill the victim).

Finally, we address the State's comments from the end of its rebuttal, in particular its statements to the effect that J.C. Johnson and Michael Walker were having their day in court and were seeking justice from the jury. Courts have found similar comments to be improper. See, e.g., United States v. Quesada-Bonilla, 952 F.2d 597, 601-02 (1st Cir. 1991) (holding improper a prosecutor's comments that "The instructions call for you to give a defendant a fair trial. But the instructions also require that you do justice to Mr. Arce, who was the victim in this case. To Mrs. Erin Benitez, who was walking in the post office with a four year old while a man armed with a .45 was walking out with a bag full of money. That is what you must look at"); see also Starks, 116 Ill. App. 3d at 389 ("It is well settled that it is improper for a prosecutor to refer to the family of a murder victim either by evidence or argument"); State v. Thompson, 266 Conn. 440,

474, 832 A.2d 626, 649-50 (2003) (holding where the prosecutor stated " 'The parents of [the victim] don't want someone arrested for this offense. They want the person that killed their son brought to justice', " "We agree that the remark was improper because it improperly appealed to the passions of the jurors by suggesting that in order to grant justice to the victim's family, the jurors should find the defendant guilty"); State v. Hart, 691 So. 2d 651, 659-60 (La. 1997); Edwards v. State, 428 So.2d 357, 359 (Fla. App. 1983) (holding, where the State argued, "All I'm going to ask you for is justice. I ask you for justice both on behalf of myself and the people of the State of Florida, *also on behalf of [victim's] wife and children*" (emphasis in original), "The prosecutor's argument was an improper appeal to the jury for sympathy for the wife and children of the victim, the natural effect of which would be hostile emotions toward the accused. *** Counsel have been consistently admonished, and the arguments have been condemned as unfair, intemperate, and unethical"). However, in light of our earlier determinations surrounding the prosecution's argument, this impropriety is isolated, brief, and, in our view, could not have been so prejudicial as to amount to plain error. See People v. Anderson, 250 Ill. App. 3d 439, 459 (1993), quoting People v. Thomas, 137 Ill. 2d 500, 524 (1990) (holding that to invoke plain error analysis in the event of a failure to object to closing arguments, "the proper standard for reviewing the prosecutor's closing arguments is whether the comments were 'so inflammatory or flagrant that defendant could not have received a fair trial or the integrity of the judicial process is jeopardized' "); see also People v. Edgecombe, 317 Ill. App. 3d 615, 620 (2000) ("Improper remarks are reversible error only when they result in substantial prejudice to the defendant, given the content and context of the language, its relationship to the evidence, and its effect on the

defendant's right to a fair and impartial trial").

## V. Prim Instruction

Defendant next contends that he was denied a fair trial because the circuit court never responded to any of the jury's notes indicating deadlock with the supplemental jury instruction recommended by our supreme court in People v. Prim, 53 Ill. 2d 62 (1972).[5] The State first

---

[5] The "Prim" instruction provides:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced that it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges-judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." Prim,

counters that we should not review the issue because defendant waived it through failing to request the instruction during the conferences between court and counsel that occurred following each time the jury contacted the court, and because of defendant's failure to include the claim in his post-trial motion. Defendant, on the other hand, asserts that his claim "is subject to review as a matter of plain error as the evidence was closely balanced and the error was so fundamental as to deny [him] a fair trial." We agree with the State.

To begin, defendant cites to no cases establishing that the failure to administer a <u>Prim</u> instruction is presumptively prejudicial, so as to constitute plain error under <u>Herron</u>'s second prong of plain error. Moreover, we think that defendant does not sufficiently appreciate his burden in attempting to show prejudicial error in a close case. As the <u>Herron</u> court explained, the evidence is close for purposes of plain error when "the evidence was so closely balanced that the error *alone* severely threatened to tip the scales of justice against him." (Emphasis added.) <u>Herron</u>, 215 Ill. 2d at 187. Defendant does not appear to attempt to demonstrate the merit of his claim under that standard. While defendant suggests that the circuit court's instruction to the jury to continue deliberating implicitly "conveyed the impression that the jury's only option was to return a verdict at all costs," defendant makes no effort to explain how that instruction necessarily resulted in a *guilty* verdict. Defendant does not and cannot point to any coercion in the circuit court's instruction along the lines of the "heed the majority" instructions that had been given up to the time of <u>Prim</u>, and which <u>Prim</u> sought to suppress. See <u>Prim</u>, 53 Ill. 2d at 76-77

---

53 Ill. 2d at 75-76.

1-04-1852

("telling a jury that if they fail to agree on a verdict the case must be retried is not correct. We do not find these remarks to be coercive, however; nor do we think that they can be said to have interfered with the deliberation of the jurors to the prejudice of the defendant or to have hastened the verdict").

Finally, in any event, we could not provide relief to defendant since he fails to demonstrate an abuse of the circuit court's discretion. See People v. Preston, 76 Ill. 2d 274, 283-84 (1979) ("it is primarily the function of the trial court to determine, on the basis of such factors as the length of time already spend in deliberation and the complexity of the issues before the jury, when the giving of a supplemental instruction becomes appropriate"). We note that in People v. Kegley, the court found the same response the circuit court gave in this case of "keep deliberating," under similar circumstances, was proper. See People v. Kegley, 227 Ill. App. 3d 48, 57 (1992) ("In this instance, the court's charge to '[k]eep deliberating' did not hasten the verdict because deliberations continued more than twice the amount of time as had elapsed prior to the jury's inquiry. Upon polling of the jury after the verdict, no juror expressed any dissatisfaction with the verdict. Thus, on the record in this case, no improper influence is apparent").

## VI. Sentencing

We next address defendant's contention that the determination of whether severe bodily injury occurred as a result of his actions, leading to the imposition of consecutive sentences, was improperly determined by the jury instead of the circuit court. The State responds that defendant has waived the issue and defendant, again, invokes plain error, contending that the error was

-68-

plain and prejudicial in a close case.

With regard to the merits, the State acknowledges two Illinois Supreme Court cases, People v. Carney, 196 Ill. 2d 518 (2001), and People v. Wagener, 196 Ill. 2d 269 (2001), on which defendant relies and appears to concede that the determination of the occurrence of severe bodily injury should, in fact, have been made by the circuit court. We are not fully convinced that procedural error occurred. Carney and Wagener emphasized that Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), was inapplicable to consecutive sentencing because, in such cases, two sentences were determined, rather than the extension of a single sentence beyond the underlying statutory maximum based on the determination of an aggravating factor, the scenario Apprendi addressed. We do not see Carney and Wagener as explicitly deciding that the existence of aggravating factors which mandate consecutive sentencing are, therefore, exclusively, for determination by the circuit court. We observe the potential anomaly, that, under that view, the same factor could be determined twice in the same case, first by the jury in deciding an extended sentence and then by the circuit court in imposing a consecutive sentence, since the factors mandating consecutive sentencing are also largely the same as those permitting extended sentences. In any event, however, defendant cannot prove prejudice and his claim must therefore fall.

Defendant contends that, by having the jury make the severe-bodily-injury determination, the circuit court allowed the jurors to be distracted from their primary determination of whether defendant inflicted those injuries. Defendant further contends that the jury's finding that he was the shooter was necessarily influenced by the jury's sympathy for the victims, which was

inappropriately highlighted by the circuit court's placement of the severe-bodily-injury determination on the jury. However, as the State contends, in making these arguments, defendant can only speculate that the jury was otherwise inappropriately influenced in its fact finding by being charged with the severe-bodily-injury determination. Walker and Johnson's plainly severe injuries were already put before the jury without objection during their testimony surrounding the shooting. Most any empathetic human being would have had sympathy for the victims. However, the circuit court instructed the jury that "Neither sympathy nor prejudice should influence you." Further, the court instructed the jury that, to find defendant guilty of aggravated battery with a firearm, the State had to prove beyond a reasonable doubt that defendant "knowingly caused injury," "by discharging a firearm." We presume that jurors follow the instructions given to them by the circuit court. See People v. Sutton, 353 Ill. App. 3d 487, 505 (2004) ("Jurors are presumed to follow the trial court's instructions"). Moreover, as we discussed above, there was enough evidence in favor of the State for a rational jury to convict defendant and we, thus, cannot find that the error of the jury receiving the task of determining severe-bodily-injury *alone* produced the conviction. See Herron, 215 Ill. 2d at 187. Therefore, defendant fails to persuade us that the jury in his case was necessarily prejudiced against him by receiving the burden of making the severe-bodily-injury determination.

## VII. Krankel

Defendant next contends that under People v. Krankel, 102 Ill. 2d 181 (1984), and its progeny, the trial court was obligated to conduct a preliminary inquiry into the bases for his *pro se* claims of ineffective assistance of counsel. He argues that, in light of the court's absolute

1-04-1852

failure to do so, remand is required.  We, however, disagree.

In Krankel, a defendant filed a *pro se* petition alleging ineffective assistance of counsel based on his attorney allegedly failing to investigate and present his alibi.  Krankel, 102 Ill. 2d at 185.  Though defendant's trial counsel argued that defendant should receive different counsel to advance his ineffective assistance claims, the trial court declined appoint new counsel.  Krankel, 102 Ill. 2d at 187-89.  In reviewing the trial court's actions, the court held:

> "In their briefs, both the State and the defendant agree that the
>
> defendant should have had counsel other than his originally appointed
>
> counsel, appointed to represent him at the post-trial hearing in regard to
>
> his allegation that he had received ineffective assistance of counsel.  We
>
> agree with the parties and remand this matter for a new hearing on the
>
> defendant's motion for a new trial with appointed counsel other than his
>
> originally appointed counsel.  If, after the hearing, the judge finds that the
>
> defendant did not in fact receive effective assistance of counsel based upon
>
> counsel's alleged failure to present a valid alibi defense, then he shall order
>
> a new trial.  If, however, he determines that the defendant received the
>
> effective assistance of counsel, he shall deny a new trial and leave standing
>
> defendant's conviction and sentence ***."  Krankel, 102 Ill. 2d at 189.

Subsequent cases further refined the procedures trial courts were to use in the event of a posttrial, *pro se* ineffective assistance of counsel motion.  As our supreme court explained in People v. Moore, 207 Ill. 2d 68, 77-79 (2003):

"In interpreting Krankel, the following rule developed. New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. Rather, when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. [Citations.] The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance. [Citations.] The appointed counsel can independently evaluate the defendant's claim and would avoid the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to defendant's position. [Citations.]

The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry in to the defendant's *pro se* allegations of ineffective assistance of counsel. [Citation.] During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what

further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient. [Citations.] Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. [Citations.]"

However, there are still minimum requirements a defendant must meet in order to trigger a preliminary inquiry by the circuit court, and we find that defendant has not met those requirements in this case.

The State contends that one of the requirements to trigger the initial inquiry is that the defendant present his claims in a written motion and that, since defendant's *pro se* contentions were presented orally, his claims do not fall under the holding of Krankel. In support of its position the State cites to People v. Carini, 357 Ill. App. 3d 103 (2005), which did note that its "[d]efendant did not present his claims to the court in a written motion for a new trial, immediately distinguishing this case from various Illinois Supreme Court precedents on which he relies (Carini, 357 Ill. App. 3d at 119). However, though distinguishing the oral motion before it from the written motions involved in various cited cases, we note that the Carini court did not actually cite to any precedents specifically prohibiting or invalidating oral *pro se* ineffective assistance of counsel motions. In fact, our own research reveals one supreme court case that

passed on such an oral motion without disparaging its manner of presentation (People v. Crane, 145 Ill. 2d 520, 532-33 (1991)); one appellate court case holding that, under the circumstances, a defendant's oral complaints amounted to a sufficient motion (People v. Sanchez, 329 Ill. App. 3d 59, 66 (2002)); and, finally, one appellate court case which, like Crane, considered the merits of a defendant's oral complaints of ineffective assistance without charging any procedural impropriety (People v. Spicer, 163 Ill. App. 3d 81, 92-93 (1987)).  It thus appears unclear whether a defendant must present his *pro se* ineffective assistance claims in a written motion in order to invoke Krankel.  But, we may still dispose of defendant's claim because he has clearly failed to meet other, established, procedural requirements.

"A bald allegation that counsel rendered inadequate representation is insufficient for the trial court to consider [as an acceptable invocation of Krankel]."  People v. Radford, 359 Ill. App. 3d 411, 418 (2005).  In fact, when a defendant's *pro se* complaints of ineffective assistance are bald, ambiguous, and/or unsupported by specific facts, they come into conflict with the general rule that a defendant may not file *pro se* motions when represented by counsel.  See People v. Rucker, 346 Ill. App. 3d 873, 883 (2003) ("Rucker's allegations are even more conclusory and ambiguous than those in Hampton.  Thus, he did not effectively raise any claim of ineffective assistance of counsel that should have been considered by the trial court, and he is not entitled to remand for consideration of his claim of ineffective assistance of counsel.  Further, because his *pro se* motion did not raise an issue of ineffective assistance of counsel, the exception to the general rule that defendants may not file *pro se* motions when they are represented by counsel does not apply.  Thus, the motion was not properly before the trial court, and it had no obligation

to consider the motion"); accord People v. Harris, 352 Ill. App. 3d 63, 71-72 (2004); see also

Radford, 359 Ill. App. 3d at 418 ("After a defendant has filed a *detailed pro se* motion, the trial

court must conduct an adequate inquiry into the defendant's *pro se* allegations of ineffective

assistance of counsel" (emphasis added)).

In the instant case, defendant merely informed the circuit court:

> "[T]here is a lot about my case that you still do not know about and there
>
> was a lot of evidence that was not submitted in my trial, in my motion.
>
> I had signed affidavits and a lot of other things that was not
>
> submitted, you know, and I blame that on–and the fact of my counsel, and
>
> I ask that, you know, that you take all that into consideration, you know."

These statements are not meaningfully distinguishable from those held to be inadequate in cases

such as Rucker, Radford, and Harris. See Rucker, 346 Ill. App. 3d at 883 ("it baldly asserts that

Rucker 'had inadequate representation by counsel,' without providing any supporting facts or

specific claims of ineffectiveness. Such a motion fails to sufficiently raise any issue of

ineffective assistance of counsel for the trial court to consider"); Harris, 352 Ill. App. 3d at 71 ("

'When I went to court, my P.D. didn't tell me we were going to trial, she said it was for a Motion.

Well, it was trial and I didn't get to call any of [*sic*] witnesses (my grandmother, my uncle and a

cousin) who were there that day and saw everything' "); Radford, 359 Ill. App. 3d at 414 (" 'if my

witness was called and my lawyer would have did a halfway good job that I would be at home

with my family' "); see also People v. Reed, 361 Ill. App. 3d 995, 1003 (2005) ("We have

reviewed [the defendant's] letter to the trial court [contending that counsel failed to subpoena

favorable witnesses], and the conclusory allegations therein do not merit remand. [Citation.]
Defendant does not specify what the witnesses would have said on the stand or how they would
have helped his case. He calls them 'witnesses,' but it is unclear what they witnessed").
Defendant contends that he would have presented the necessary details but for the court's denying
him the opportunity, but we find his contention to be unsupported by the record. See People v.
Cummings, 351 Ill. App. 3d 343, 351 (2004) ("At a minimum, the trial court must afford the
defendant an opportunity to specify and support his complaints"). There is no indication of the
circuit court limiting defendant's articulation of his grievances when the court first inquired if he
had anything to say. While defendant makes much of the court's statement that it was "not going
to retry the case today" when defendant next spoke, we note that, at that point, defendant only
appeared to be returning to his initial, fully expressed, though unspecific, contentions. Moreover,
though we have already concluded that a formal, written presentation would not have been
necessary to invoke a preliminary inquiry under Krankel and Moore, we think it is still
significant that the circuit court never took any action or made any statement to preclude or
dissuade defendant from making such a presentation.

Finally, by defendant's own account, his attorney was aware of the evidence since he had
it in his possession. The decisions of what witnesses to call and what evidence to present are
generally unassailable matters of trial strategy that cannot form the basis of a claim of ineffective
assistance of counsel. See People v. Enis, 194 Ill. 2d 361, 378 (2000) ("decisions concerning
whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to
the discretion of trial counsel. [Citation.] Such decisions enjoy a strong presumption that they

reflect sound trial strategy, rather than incompetence [citation.], and are, therefore, generally immune from claims of ineffective assistance of counsel"); People v. Dean, 226 Ill. App. 3d 465 (1992) (holding counsel's declination to present a witness of whom he was aware would be presumed to be a matter of trial strategy). Where a defendant's *pro se* posttrial ineffective assistance claims address only matters of trial strategy, the court may dismiss those claims without further inquiry. As the court observed in People v. James, 362 Ill. App. 3d 250, 257 (2005):

> "Even if the pretrial examination of defendant's [*pro se* ineffective assistance] claim was insufficient, the facts of this case still do not warrant remand.
>
> In similar cases, this court has questioned whether a defendant has even adequately raised an ineffective-assistance-of-counsel allegation to warrant an investigation. See Pope, 284 Ill. App. 3d at 334, 219 Ill. Dec. 750, 672 N.E.2d at 68 (where the defendant did not file a posttrial motion or ask for new counsel). There we held that when a trial court simply becomes aware that a defendant has criticized counsel's performance, the court has no duty to investigate the defendant's claim if it is patently without merit or unsupported by specific factual allegations or in other words, if it would be summarily dismissed during the first stage of a postconviction proceeding."

Therefore, the circuit court did not err in declining to conduct even the preliminary

1-04-1852

inquiry into defendant's complaints as described in <u>Moore</u>.

VIII.  Ineffective Assistance of Counsel

Finally, defendant contends that he is entitled to a new trial because he received ineffective assistance of counsel.  We, however, disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney committed such serious errors as to fall beyond an objective standard of reasonableness, and that, without those objectively unreasonable errors, there was a reasonable probability that his trial would have resulted differently.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-694, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-2068 (1984); <u>People v. Albanese</u>, 104 Ill. 2d 504, 526 (1984).  In reviewing an attorney's actions, we show deference to the attorney's decisions.  <u>Strickland</u>, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.  There is a strong presumption that an attorney's actions fall within the wide range of choices that could be considered adequate counsel.  <u>Strickland</u>, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.  Mistakes in strategy or tactics do not, alone, amount to ineffective assistance of counsel, nor does the fact that another attorney might have handled things differently; in fact, counsel's strategic choices are "virtually unchallengeable." <u>People v. Palmer</u>, 162 Ill. 2d 465, 476 (1994).  See also <u>People v. Odle</u>, 151 Ill. 2d 168, 173 (1992) (holding that a defendant is entitled to competent, not perfect counsel).  A reasonable probability that a defendant's trial would have resulted differently without attorney errors "is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.  In determining whether a defendant has established his attorney's unreasonable errors and the

reasonable probability of a different result, a reviewing court must "consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695. See also People v. Follins, 196 Ill. App. 3d 680, 687 (1990) (whether attorney's failure to make a motion to suppress is ineffective assistance "depends on the circumstances of each case").

Defendant's first specific contention is that his counsel was ineffective for failing to introduce Coprich's written statement, "or to otherwise clarify the information contained in the statement." Defendant contends that "considerable confusion during the jury's deliberations" resulted. However, we cannot conclude that it was objectively unreasonable for trial counsel to not introduce the statement or clarify its contents, or that prejudice to defendant resulted therefrom. Defendant argues that with Coprich's statement before it, the jury would have clearly seen that it contained no references to the fight between defendant, Moten and Sakina that he testified to, and that the jury would have therefore discredited Coprich's testimony and returned an acquittal. However, that the statement contained no reference to that fight was also made clear through testimony surrounding the statement, including testimony elicited by the State in the following exchange:

> "Ms. COPPELSON [Assistant State's Attorney]: You said you were asked
>
> about the fight?
>
> Mr. COPRICH: Yes.
>
> Ms. COPPELSON: But when you read the statement over, the statement
>
> was about the shooting, correct?
>
> Mr. COPRICH: Yes.

\*\*\*

> Ms. COPPELSON: In fact, on the top of that statement, it says 'The statement regarding the shooting on September 24 of 2000,' correct?
>
> Mr. COPRICH: Yes.
>
> Ms. COPPELSON: And it says, 'The statement involving the shooting involving Michael Walker and J.C. Johnson on September 24 of 2000, on 150th and Honore.'
>
> Mr. COPRICH: Yes."

Moreover, as we noted previously in addressing the sufficiency of the evidence, Coprich's potential failure to inform the authorities of the fight is not of particular significance with respect to his identification of defendant as the shooter. The lack of power in this impeachment evidence distinguishes the instant case from People v. Mejia, 247 Ill. App. 3d 55 (1993), a vehicular reckless homicide case on which defendant relies, where the defendant's counsel failed to fully present and exploit police reports contradicting two witnesses' trial testimony that they saw the crash and observed defendant driving the at-fault vehicle.

Defendant's second ineffective assistance claim surrounds his counsel's failure to object to the prosecution's references to "civilized society," "human decency," and "simple justice" in closing argument. However, as we demonstrated above, these arguments were proper. Therefore, defendant's counsel could not have been objectively unreasonable in failing to object. Moreover, even if improper, they would have been harmless and, thus, Strickland's second prong would not have been met.

Defendant's third complaint of his trial counsel is that they failed to preserve as error their request that the circuit court question Uriaus as to why he disobeyed the court's orders. However, as we observed in our plain error review of defendant's allegations of juror misconduct, defendant has failed to do anything more than speculate surrounding any prejudice that may have resulted. Such speculation, again, is not enough to gain relief under Strickland's second prong. See People v. Olinger, 176 Ill. 2d 326, 363 (1997) ("This pure speculation falls far short of the demonstration of actual prejudice required by Strickland").

Next, defendant challenges his counsel's failure to request a Prim instruction. We first observe that defendant cites to no authority holding that the failure to request a Prim instruction may amount to ineffective assistance. Moreover, defendant, again, only speculates as to any prejudice that may have resulted from the absence of a request for that instruction, contending that without "the Prim instruction, members of the jury in the minority *may* have been pressured to change their minds as the jury believed that only one option existed for them-to return a verdict." (Emphasis added.) However, again, defendant may not carry his burden of proving prejudice under Strickland merely by speculating. See Olinger, 176 Ill. 2d at 363.

Finally, defendant argues that his trial counsel was ineffective for concurring with the court's explanation to defendant that the state appellate defender would prepare his post-trial motions and for continuing to represent him after the court recommended new counsel on his motion to reconsider his sentence. We may quickly dispose of the latter argument because defendant does not challenge the adequacy of the motion to reconsider sentence that his original trial counsel prepared. With respect to the prior argument, defendant contends that he was

prejudiced because the assurances of his counsel that the state appellate defender would address his concerns of ineffective assistance of counsel led him to not press the matter himself. However, defendant still fails to demonstrate actual prejudice since he makes no attempt to show that, had he been afforded the opportunity to press his claims of ineffective assistance, the ultimate result would have been the circuit court's grant of a new trial. As we pointed out, these allegations were not sufficient to invoke Krankel, nor do they meet the prejudice prong of Strickland, in that they do not allege sufficient facts to warrant a conclusion that, had the attorney provided the assistance requested, a different outcome would have resulted.

CONCLUSION

For all the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

McBRIDE, P.J. and CAHILL, J., concur.